## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
-----------------------------------------------------------------X
ALTAIR GLOBAL CREDIT OPPORTUNITIES      )
FUND (A), LLC, ANDALUSIAN GLOBAL        )
DESIGNATED ACTIVITY COMPANY, GLENDON    )
OPPORTUNITIES FUND, L.P., MASON CAPITAL )
MASTER FUND LP, NOKOTA CAPITAL MASTER   )
FUND, L.P., OAKTREE-FORREST MULTI-      )
STRATEGY, LLC (SERIES B), OAKTREE       )
OPPORTUNITIES FUND IX, L.P., OAKTREE    )
OPPORTUNITIES FUND IX (PARALLEL 2), L.P.,)
OAKTREE VALUE OPPORTUNITIES FUND, L.P., )
OCHER ROSE, L.L.C., AND SV CREDIT, L.P., )
                                        )
               Plaintiffs,              )
                                        )
               -against-                )
                                        )
THE UNITED STATES OF AMERICA,           )
                                        )
               Defendant.               )
                                        )
-----------------------------------------------------------------X
```

**No.  17-970 C**

**Chief Judge Braden**

## AMENDED AND SUPPLEMENTED COMPLAINT

Plaintiffs Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund LP, Nokota Capital Master Fund, L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Value Opportunities Fund, L.P., Ocher Rose, L.L.C., and SV Credit, L.P., by and through their attorneys, bring this action under the Fifth Amendment to the United States Constitution and 28 U.S.C. § 1491, seeking compensation for the taking of plaintiffs' property.  In support thereof, plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.     This is an action for just compensation from the United States of America for the taking of plaintiffs' constitutionally-protected property.

2.     Plaintiffs are owners of secured bonds issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "ERS") in 2008.  The proceeds of these bonds (the "ERS Bonds" or the "Bonds") were used to pay benefits to retirees and to reduce the ERS's underfunded accrued actuarial liabilities.  The ERS Bonds were secured by collateral that included, among other things, all employer contributions from Puerto Rico government employers (including municipal employers, public corporations, and the central government of Puerto Rico) and the ERS's legal right to receive those contributions.  The collateral pledged to support the ERS Bonds was sufficient to service the interest on the Bonds for the life of the bond issue and to repay the principal amount of the Bonds in full at maturity. The ERS Bond Resolution gave plaintiffs the contractual right to guaranteed timely payment of principal and interest by the ERS.  Indeed, just months ago, in prior litigation, the ERS Bonds were described as oversecured.

3.     On June 30, 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016), *codified at* 48 U.S.C. § 2101, *et seq.*, creating a federal oversight board for Puerto Rico (the "Oversight Board" or the "Board").  The Oversight Board is statutorily charged with helping Puerto Rico achieve fiscal responsibility and obtain access to the capital markets.  48 U.S.C. § 2121.  To enable the Oversight Board to achieve this mission, Congress conferred broad sovereign powers on the Board.  Among other things, Congress granted the Board the power to approve a "fiscal plan" dictating Puerto Rico's taxation, spending, and finances.

4.     Using these statutory powers, the Oversight Board planned and directed the taking of plaintiffs' constitutionally-protected property.  Specifically, working with and through the Commonwealth, the Oversight Board designed and mandated legislation transferring plaintiffs'

collateral to the Commonwealth without compensation of any kind. The Puerto Rico legislature passed this legislation on June 25, 2017, and the Oversight Board adopted it on behalf of the Puerto Rico Governor on June 30, 2017. It was later signed by the Governor on July 26, 2017. Further legislation was enacted on August 23, 2017 at the direction of the Oversight Board and as required by a Fiscal Plan (as described in 48 U.S.C. § 2141) that was certified by the Oversight Board and compulsory under PROMESA. Under the Takings Clause of the Fifth Amendment to the United States Constitution, plaintiffs are entitled to just compensation for the taking of the collateral and of the contractual right to timely payment of principal and interest by the ERS. Because the ERS Bonds were oversecured at all relevant times, just compensation is payment of the principal amount of the ERS Bonds together with all interest accrued to the date of payment.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action and venue is proper in this Court, pursuant to 28 U.S.C. § 1491(a), because this action asserts claims against the United States under the Fifth Amendment.

## THE PARTIES

6.     Plaintiff Altair Global Credit Opportunities Fund (A), LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1888 Century Park East, Los Angeles, CA 90067-1702.

7.     Plaintiff Andalusian Global Designated Activity Company is a designated activity company limited by its shares incorporated under the laws of Ireland located at 70 Sir John Rogerson's Quay, Dublin 2, Ireland.

8.      Plaintiff Glendon Opportunities Fund, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands located at Ugland House, South Church Street, Grand Cayman, Cayman Islands, KY1-1104.

9.      Plaintiff Mason Capital Master Fund, LP is a limited partnership organized and existing under the laws of the Cayman Islands located at PO Box 309, Ugland House, George Town KY1-1104.

10.      Plaintiff Nokota Capital Master Fund, L.P. is a limited partnership organized and existing under the laws of Cayman Islands with its principal place of business at 1330 Avenue of the Americas, 26th Floor, New York, NY  10019.

11.      Plaintiff Oaktree-Forrest Multi-Strategy, LLC (Series B) is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA  90071.

12.      Plaintiff Oaktree Opportunities Fund IX, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business located at 333 South Grand Avenue, 28th Floor, Los Angeles, CA  90071.

13.      Plaintiff Oaktree Opportunities Fund IX (Parallel 2), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

14.      Plaintiff Oaktree Value Opportunities Fund, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

15.      Plaintiff Ocher Rose, L.L.C. is a Delaware limited liability company located at P.O. Box 1226, New York, NY 10150.

4

16.    Plaintiff SV Credit, L.P. is a limited partnership organized and existing under the laws of Delaware located at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

17.    Defendant is the United States of America.

## OTHER ENTITIES

18.    The Commonwealth of Puerto Rico is a United States territory subject to the laws of the United States and the plenary jurisdiction of Congress.

19.    The Oversight Board is an entity created pursuant to PROMESA to assist the Commonwealth, including certain of its instrumentalities, in managing their public finances and for other purposes.   The Board is a federal entity for constitutional purposes pursuant to the analysis of the United States Supreme Court in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995).

20.    The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") is an entity created pursuant to the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, P.R. Act No. 2-2017, for the purpose of acting as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, instrumentalities, subdivisions, public corporations, and municipalities.

21.    The ERS is a trust created by the Legislature of the Commonwealth to provide pension and other benefits to employees of the government of the Commonwealth, members and employees of the Legislature, and employees of certain public corporations and municipalities in Puerto Rico.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

22.    Plaintiffs' claim is founded on the Fifth Amendment to the United States Constitution, which provides in pertinent part that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.

## FACTUAL ALLEGATIONS

### I.    THE ERS

A.    The ERS Enabling Act

23.    The ERS is a trust created by Act No. 447 of May 15, 1951 of the Legislature of the Commonwealth (the "ERS Enabling Act") to provide pension and other benefits to officers and employees of the government of the Commonwealth, members and employees of the Legislature, and officers and employees of certain public corporations and municipalities of the Commonwealth.  3 L.P.R.A § 761.  The ERS was established as an independent, self-governing entity separate from the Commonwealth and from the Commonwealth's agencies and instrumentalities.  3 L.P.R.A. § 775.  The ERS Enabling Act provided that the ERS is to be governed by an eleven-member Board of Trustees, which is responsible for setting policy for, and overseeing the operations of, the ERS.  *Id.*

24.    The ERS Enabling Act gave the Board of Trustees blanket authorization to incur debt on behalf of the ERS and to secure such debt with the ERS's assets.  Specifically, it authorized the Board of Trustees to "seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the [ERS]." 3 L.P.R.A. § 779(d).

B.    Employer Contributions

25.    The ERS is funded by employer contributions, employee contributions, and investment earnings on its undistributed funds.   Employer contributions are the largest component of this income stream, and they constitute a legal asset of the ERS.   The ERS has a statutory right to receive these employer contributions, and employers are required by statute to make them.

26.    The ERS receives employer contributions both from the Commonwealth and from various municipalities and public corporations of the Commonwealth.   The Commonwealth is responsible for approximately 59 percent of the employer contributions the ERS receives, while municipalities and public corporations account for the rest.   As of the commencement of the ERS Title III case, the Commonwealth did not hold or own any interest in employer contributions owed by municipalities or public corporations to ERS.

27.    By statute, employer contributions must be sufficient to maintain the actuarial integrity of the ERS—*i.e.*, they must cover the difference between the total cost of benefits provided by the ERS and administrative costs, reduced by contributions made by employees themselves.   One type of employer contribution is calculated based on a percentage of payroll. Prior to July 1, 2017, each employer was obligated to contribute a minimum of 15.525 percent of the compensation regularly received by eligible employees on a monthly basis.   3 L.P.R.A. § 787f.   These amounts were scheduled to increase annually.   *Id.*   The employer contributions by the Commonwealth, municipalities, and public corporations now required to be paid on account of retirement obligations to retirees covered by ERS are greater than they were prior to the commencement of the ERS Title III case.

28.    The critical importance of employer contributions to the ERS, and the ERS's authority to enforce its rights, are reflected in a series of provisions in the ERS Enabling Act. For example, an employer's failure to pay timely its contributions to the ERS may be punishable as a misdemeanor.  3 L.P.R.A. § 781a(e), § 781a(e)(f).  If an employer's contributions to the ERS are in arrears for more than 30 days, the ERS's claim to those contributions has priority over any other outstanding debt of that employer.  *Id.* § 781a(h).  If a municipality does not make its employer contributions to the ERS, the ERS has the power to intercept or garnish the municipality's property tax revenues.  *Id.* § 781a(g).  If agencies, public corporations, and instrumentalities of the Commonwealth fail to make employer contributions, the ERS is authorized to issue a certificate of debt for immediate payment of the arrearages from the Department of Treasury.  *Id.* § 781a(h).  The ERS also is entitled to receive interest on these delinquent contributions.  *Id.*

29.    Notwithstanding these statutory requirements, employer contributions have not been sufficient to maintain the actuarial integrity of the ERS.  Employer contributions have been *less than* the amounts necessary to pay current benefits, *less than* the benefit liabilities being accrued, and *less than* the amounts necessary to improve—or even maintain—the funded status of the ERS.  As a result, employer contributions have, at most, only funded a portion of benefit payments contemporaneously coming due.  For many years, they have not been used to increase the ERS's assets or improve its funded status.

## II.    PENSION FUNDING BONDS ISSUED BY THE ERS

30.    In 2008, facing unfunded accrued actuarial pension liability, the ERS board used its powers under the ERS Enabling Act to pass a Board resolution authorizing the issuance of secured bonds.

A.    The ERS Bond Resolution

31.    The ERS Bond Resolution governs the contractual relationship between the ERS and plaintiffs with respect to the ERS Bonds.  *See* Pension Funding Bond Resolution (Jan. 24, 2008) (the "ERS Bond Resolution") (attached as Exhibit A).

32.    The ERS Bond Resolution constitutes a valid, binding contract between the ERS and holders of ERS Bonds.  ERS Bond Resolution § 102.  It affirms that the ERS Bonds are valid, legally binding obligations of the ERS, *id.* §§ 201, 705, and that the Bonds are not obligations of the Commonwealth or any of its agencies or instrumentalities, *id.* § 201.

B.    Issuance of the ERS Bonds

33.    The ERS issued bonds on the following dates:

    a.    "Series A" Bonds totaling $1,588,810,799.60 on January 31, 2008.

    b.    "Series B" Bonds totaling $1,058,634,613.05 on June 2, 2008.

    c.    "Series C" Bonds totaling $300,202,930 on June 30, 2008.

34.    Most of the ERS Bonds were sold to individual residents of the Commonwealth and to local businesses.

35.    All of the bond issue's net proceeds (after costs of issuance and required reserves) were used to pay benefits to retirees or invested to provide for future benefit payments.

36.    As of February 2017, the aggregate principal amount of the interest-bearing ERS Bonds plus the accreted[1] value of the zero coupon or capital appreciation ERS Bonds totaled approximately $3,156,000,000.

37.    Plaintiffs are beneficial holders of these Bonds.

38.    The Oversight Board has previously described the ERS Bonds as oversecured.[2]

---

[1] The accreted value of the capital appreciation ERS Bonds refers to the accrued portion of the face amount.

C.    The "Pledged Property"

39.    The foundation of the ERS bond transaction was an extensive security package necessary to protect the investment made by holders of ERS Bonds.  Without this security package, it would have been impossible for the ERS to sell the Bonds in the first place.

40.    The collateral underlying the security package was called "Pledged Property." The ERS Bond Resolution defined Pledged Property to include:

(a) all "Revenues," including, among other things, all employer contributions paid from and after the date of the ERS Bond Resolution received by the ERS or the Fiscal Agent "and any assets in lieu thereof or derived thereunder which are payable to [the ERS] pursuant to [the ERS Enabling Act]";

(b) all "right, title, and interest of [the ERS] in and to" the "Revenues" and "all rights to receive the same";

(c) the funds, accounts, and subaccounts held for the benefit of bondholders;

(d) any and all other rights and personal property of every kind pledged and assigned by the ERS for additional security; and

(e) "any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property," including, "without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of" such property.

ERS Bond Resolution § 501 & Exh. B, VI-33, VI-36, VI-37.

---

[2] Brief of Amicus Curiae Fin. Oversight and Mgmt. Bd. for Puerto Rico in Support of Respondents-Appellees Urging Affirmance of the District Court Order at 18, No. 16-2433 (1st Cir. Dec. 23, 2016) ("The [ERS Bondholders] have a substantial equity cushion as a result of the reserve accounts and the perpetual revenue streams.").

41.     To assure that the Pledged Property would remain available to secure the Bonds, the Bond Resolution explicitly required the ERS to pursue all available legal remedies to collect employer contributions that were delinquent or inadequate. *Id.* § 701, 709.

42.     The security interests in and liens on the Pledged Property are "valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the [ERS], irrespective of whether such parties have notice thereof." *Id.* § 501.

43.     The Pledged Property was required to be, and as of the commencement of the PROMESA Title III case for the ERS on May 21, 2017 was, free and clear of any other pledge, lien, charge, or encumbrance. *Id.* § 705.

44.     The ERS was required to use the Pledged Property to make timely principal and interest payments on the ERS Bonds, before it spent or used any of the funds for any other purpose. *Id.* §§ 501, 701, & Exh. B, VI-36.

D.     Transfer of Contributions to Fiscal Agent

45.     The ERS Bond Resolution established the mechanism by which the employer contributions were to be accounted for, deposited, and distributed. The ERS Bond Resolution provided that a "Fiscal Agent" would be responsible for administering these matters. At all relevant times, the Bank of New York Mellon has served as the Fiscal Agent.

46.     The ERS Bond Resolution requires the ERS to transfer employer contributions to the Fiscal Agent on the last business day of each month. *Id.* § 504. By the next business day, the Fiscal Agent must deposit the employer contributions into the "Revenue Account," except in limited circumstances not relevant here. *Id.* Monies in the Revenue Account are to be applied, in order of priority, (a) to an account to make debt service on senior bonds, (b) to a reserve account for senior bonds, (c) to an account to make debt service on subordinated bonds, (d) to a

reserve account for subordinated bonds, (e) to pay operating expenses, and (f) to a general reserve account. *Id.* The Fiscal Agent is then responsible for making timely interest and principal payments to ERS Bondholders from these accounts. *Id.* § 505(4), (5).

## III.  THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT

### A.    The Financial Oversight and Management Board

47.    On June 30, 2016, Congress passed PROMESA.  The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes."  H.R. 5278, 114th Cong. (2016) (preamble).

48.    The Oversight Board is a federal entity: the federal government created it and controls it.  Congress created the Oversight Board in furtherance of governmental objectives pursuant to its power under Article IV, Section 3 of the United States Constitution "to dispose of and make all needful rules and regulations for territories."  48 U.S.C. §§ 2121(b)(1)-(2). Congress's purpose in creating the Oversight Board—"to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets"—fell squarely within this constitutional mandate. *Id.* § 2121(a).

49.    The Oversight Board consists of seven members, each of whom was appointed by the President on August 31, 2016. *Id.* § 2121(e)(1)(A).  The President was required to, and did, select the members of the Oversight Board from lists provided by other federal government officials, including the Speaker of the House of Representatives, the Majority Leader of the Senate, the Minority Leader of the House of Representatives, and the Minority Leader of the Senate. *Id.* § 2121(e)(2)(A).  Moreover, although the Governor of Puerto Rico (or his designee) is an *ex officio* member of the Oversight Board, he or she has no voting rights; only the federally

appointed members of the Oversight Board may vote on its policies and its other actions. *Id.*
§ 2121(e)(3).

50.    The President also has the sole authority to remove voting members from the
Oversight Board, reappoint members to successive terms, and fill vacancies. The voting
members of the Oversight Board serve three year terms, *id.* § 2121(e)(5)(A), and the President
may remove a voting member of the Oversight Board for cause during that term, *id.*
§ 2121(e)(5)(B). The President may also reappoint a voting member to consecutive terms and
fill vacancies on the Oversight Board, provided that the appointment is made on the same basis
by which the original member was appointed. *Id.* §§ 2121(e)(5)(D), (e)(6).

51.    The voting members of the Oversight Board are bound by federal ethics rules and
not by Puerto Rico law. *Id.* §§ 2121(g), 2129.

52.    The Oversight Board uses federal property and services in the course of executing
its mission. PROMESA expressly authorizes the Board to use federal government facilities or
equipment. *Id.* § 2122. The federal Administrator of General Services is obligated to provide
administrative support services to the Oversight Board. *Id.* § 2124(n). Federal employees may
be hired by or detailed to the Oversight Board in accordance with the Intergovernmental
Personnel Act of 1970. *Id.* § 2123. In each case, the property, services or employees used by the
Board from other federal government departments or agencies may be provided on either a
reimbursable or non-reimbursable basis. *Id.* §§ 2122, 2123 and 2124.

53.    The Oversight Board lists its official address as the Jacob Javits Federal Building,
26 Federal Plaza, New York, New York.[3]

---

[3] *See In re Employees Retirement System of the Commonwealth of Puerto Rico*,
Complaint at 4, Case 3:17-cv-01685 (D. P.R. May 21, 2017), ECF # 1.

54.    The Oversight Board also has the power to secure information directly from federal departments or agencies, notwithstanding any other laws to the contrary.  48 U.S.C. § 2124.  Already, the Oversight Board has "received multiple technical assistance briefings from the United States Department of Treasury" pursuant to this provision of PROMESA.[4]

55.    The Oversight Board must provide a budget each fiscal year to, among others, the President, the House Committee on Natural Resources, and the Senate Committee on Energy and Natural Resources, and must issue certifications in connection therewith.  48 U.S.C. §§ 2127(a) and 2143(c).  The board must also make annual reports to the President and Congress.  *Id.* at § 2148.  Board members have regularly communicated with Congress, the United States Treasury Department, and other government agencies, and have testified before Congress on the Board's progress in discharging its federal mandate.[5]

56.    Tellingly, statements made in Congress during PROMESA's passage repeatedly referred to the Oversight Board as the "*federal* oversight board."[6]  In fact, the House Report accompanying PROMESA explained that the Congressional Budget Office should treat the Oversight Board as a federal entity because of the "significant degree of federal control involved

---

[4] *See* Declaration of Jose Carrión III in Support of Fin. Oversight and Mgmt. Bd.'s Motion for an  Extension of Time to File a Response to Pl.'s Motions For Relief From the Automatic Stay and for Leave to Intervene, *Brigade Leveraged Capital Structure Fund Ltd., et al v. Alejandro Garcia-Padilla, et al.*, Case No. 16-1610 at ¶ 6 (D. P.R. Oct. 7, 2016), ECF 126-1.

[5] *See* The Financial Oversight and Management Board for Puerto Rico, https://juntasupervision.pr.gov/index.php/en/documents/.

[6] *See, e.g.,* 162 Cong. Rec. S4699, S4700 (daily ed. June 29, 2006) (statement of Sen. Cornyn); 162 H3600, H3605 (daily ed. June 9, 2016) (statement of Rep. Maloney);  *Discussion Draft, H.R. ____, "Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)": Hearing Before the H. Comm. on Natural Resources*, 114th Cong. 56-59 (2016) (statement of Rep. Pierluisi); 162 Cong. Rec. S1848, S1849 (daily ed. Apr. 11, 2016) (statement of Sen. Inhofe);  *The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority Oversight Hearing Before the H. Comm. on Natural Resources*, 114th Cong. 43 (2016) (statement of Rep. Pierluisi).

in [the Oversight Board's] establishment and operations." 114 H. Rpt. 602, Part 1 (Report of the Committee on Natural Resources).

57.     Because the Oversight Board is so clearly a part of the federal government, its actions are themselves the actions of the United States.  Thus, when the Oversight Board takes actions to confiscate private property—such as the multi-billion dollar collateral package securing the ERS Bonds—it is a compensable taking by the United States.

58.     PROMESA recited that the Oversight Board would "be created as an entity within the territorial government" of Puerto Rico and recites that it "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c).  Notwithstanding this language, the Supreme Court's decision in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), holds that such statutory disclaimers do not speak to whether an entity is the federal government for constitutional purposes.  Instead, such disclaimers only define the entity for other statutory purposes.  Under the test set forth in *Lebron*, the Oversight Board is a part of the federal government for constitutional purposes.

B.     PROMESA Fiscal Plans

59.     PROMESA requires the Commonwealth to submit an annual "fiscal plan" for approval by the Oversight Board. 48 U.S.C. § 2141(a).

60.     The purpose of the fiscal plan, according to PROMESA, is to "provide a method to achieve fiscal responsibility and access to the capital markets." *Id.* § 2141(b).  Among other things, each fiscal plan must provide estimates of revenues and expenditures that are based either on the laws currently in effect or on "specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan." *Id.* §2141(b)(1)(A).  PROMESA circumscribes the Commonwealth's discretion in drafting its fiscal plans; in submitting its plans, the Commonwealth is required to "adopt appropriate recommendations submitted by the Oversight

15

Board" and to "include such additional information as the Oversight Board deems necessary." *Id.* § 2141(b)(1)(K)-(L).

61.     Under PROMESA, the Governor cannot submit a budget to the Commonwealth legislature until the Oversight Board has certified a fiscal plan. *Id.* § 2141(c). The Oversight Board, moreover, has the "sole discretion" to determine if the Governor's proposed fiscal plan meets PROMESA's requirements. *Id.* § 2141(c)(3). If the Oversight Board determines that a fiscal plan is deficient, PROMESA requires it to so inform the Governor and include specific recommendations for revisions to the fiscal plan to correct the deficiencies. *Id.* If the Governor fails to submit a fiscal plan that meets PROMESA's requirements, the Oversight Board can step in, develop its own plan, and submit it to the Governor. *Id.* § 2141(d)(2).

62.     The Oversight Board also has the sole discretion to determine whether "instrumentalities" of the Commonwealth, like the ERS, must submit their own fiscal plans or will be included in the Commonwealth's. *Id.* § 2121(d)(1). Whether separate or combined, however, the budgets of the Commonwealth and its instrumentalities, including the ERS, must comply with the certified fiscal plans. *Id.* § 2142. Similarly, future Commonwealth legislation must comply with the certified fiscal plans of the Commonwealth and its instrumentalities, including the ERS. *Id.* § 2144. Indeed, the provisions of PROMESA "prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." 48 U.S.C. § 2103.

C.     PROMESA Title III

63.     Title III of PROMESA authorizes the Oversight Board to file a petition to restructure the debts of a government instrumentality in a court-supervised adjustment process similar to Chapter 9 of the Bankruptcy Code. The Oversight Board has the sole authority to file a restructuring petition, *id.* § 2164(a), submit a plan of adjustment, *id.* § 2172, and modify the

plan of adjustment, *id.* § 2173.  The Oversight Board also serves as the representative of the debtor in a PROMESA Title III case.  *Id.* § 2175.  Any plan of adjustment for the Commonwealth or the ERS under PROMESA Title III must be "consistent with the applicable Fiscal Plan certified by the Oversight Board."  *Id.* § 2174(b)(7).

## IV.    THE COMMONWEALTH FISCAL PLAN

64.    One of the Oversight Board's first actions was to instruct the Governor to provide a fiscal plan for the Commonwealth by October 14, 2016. [7]  Using its powers over the Commonwealth fiscal plan, the Oversight Board then worked with and through the Commonwealth to create the unconstitutional legislation that is the subject of this suit, and ultimately adopted it on behalf of the Puerto Rico Governor on June 30, 2017.

65.    The Commonwealth's original October 14, 2016 fiscal plan would have left intact the ERS and the system described above for making pension payments. [8]  On November 23, 2016, however, the Oversight Board rejected this approach and notified the Governor that the fiscal plan failed to meet PROMESA's requirements. [9]  The Oversight Board instead identified a series of changes the Commonwealth would have to make before the Board would certify the plan.  These changes included revising the pension system and addressing the ERS's unfunded pension liabilities.  The Oversight Board repeated these directions in letters of December 20,

---

[7] Financial Oversight and Management Board for Puerto Rico, First Meeting of the Board, Minutes (Sept. 30, 2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/581f99a1e8.pdf.

[8] Commonwealth of Puerto Rico Fiscal Plan at 11 (Oct. 14, 2016), https://juntasupervisipr.gov/wp-content/uploads/wpfd/52/58210006a3536.pdf.

[9] Financial Oversight and Management Board for Puerto Rico, Oversight Board Addresses Larger Fiscal Deficit at 2 (Dec. 20, 2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/58595509cff01.pdf.

2016, and January 18, 2017. Both times, the Board told the Commonwealth to consider new payment sources and mechanisms for pensions.[10]

66.    The Commonwealth submitted a revised fiscal plan to the Oversight Board on February 28, 2017. Among other things, the revised fiscal plan proposed increasing employer contributions to solve the problem of unfunded pension liabilities—*i.e.*, fully rather than partially funding currently-existing pension benefits and, for prospective benefits, moving away from a traditional pension plan to a system of individual retirement accounts into which employers would make defined contributions.[11]

67.    On March 13, 2017, after a public meeting, the Oversight Board certified the Commonwealth's revised fiscal plan, subject to a mandatory amendment regarding pensions.[12] The amendment required the Commonwealth and the Board to take legislative measures by June 30, 2017, that would compel the ERS to liquidate its assets and transfer all of the proceeds to the Commonwealth without providing any consideration to ERS Bondholders on account of transferring their collateral. Thereafter, the Commonwealth itself would begin making payments directly to pension beneficiaries from its undifferentiated General Fund, bypassing the existing ERS structure. Finally, this legislation, once enacted, would divert payment of future employer contributions—including employer contributions owed by municipalities and public corporations

_____

[10] Letter from Financial Oversight and Management Board for Puerto Rico to Governor Alejandro García Padilla and Governor-Elect Ricardo Rosselló Nevares at 3 (Dec. 20, 2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58598734087c1.pdf; Letter from Financial Oversight and Management Board for Puerto Rico to Governor Ricardo Rosselló Nevares at 2 (Jan. 18, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/587fea840f998.pdf.

[11] Commonwealth of Puerto Rico Fiscal Plan (Feb. 28, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58b79bb6009fd.pdf.

[12] Financial Oversight and Management Board for Puerto Rico, Fiscal Plan Certification (Mar. 13, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c6e140a43d4.pdf.

in which the Commonwealth held no interest as either creditor or debtor and Commonwealth employer contributions that the Commonwealth owed but did not own—from the ERS directly to the Commonwealth.  The Commonwealth's revised fiscal plan combined with the Oversight Board's pension amendment therefore appropriated—without compensation—the Pledged Property securing the ERS Bonds.

68.     On May 29, 2017, the Oversight Board sent a letter—not made public or disclosed to plaintiffs—to AAFAF (which serves as the fiscal agent, financial advisor, and reporting agent of the Commonwealth and its agencies and instrumentalities) making certain undisclosed revisions to the Commonwealth's revenue forecasts.  Two days later, in response to the Board's letter, AAFAF requested that the Commonwealth's certified fiscal plan be amended to reflect that the Commonwealth would have an additional $734 million in revenues.[13]  These funds, of course, did not fall out of the sky.  AAFAF disclosed that the revenues were in part "due to pension reimbursements from other agencies," that is, the employer contributions due to the ERS from agencies, municipalities and public corporations that the Commonwealth did not own or hold any interest, which would now be diverted from the ERS to the Commonwealth.[14] The Oversight Board adopted these revisions.

69.     In sum, from the time the Oversight Board was appointed, it worked with and through the Commonwealth, and used the Commonwealth as its agent, to make changes to the pension system to take the Pledged Property belonging to plaintiffs and not belonging to the Commonwealth and divert it, without compensation to ERS Bondholders, to the Commonwealth.

---

[13] AAFAF Letter (May 31, 2017), Exhibit A to Letter from Financial Oversight and Management Board for Puerto Rico to Governor Ricardo Rosselló Nevares, https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5931f0e61a0ce.pdf.

[14] *Id.* at 1.

## V.    TITLE III CASES

70.    On May 3, 2017, the Oversight Board approved and certified the filing of a PROMESA Title III petition for the Commonwealth.[15]

71.    On May 21, 2017, the Oversight Board approved and certified the filing of a separate PROMESA Title III petition for the ERS.[16]

## VI.    JOINT RESOLUTION FOR OTHER ALLOCATIONS FOR FISCAL YEAR 2017-2018 ("JOINT RESOLUTION 188")

72.    The Puerto Rico legislature passed Joint Resolution 188[17] on June 25, 2017, and the Oversight Board adopted it on behalf of the Governor on June 30, 2017.[18]

73.    The ostensible purpose of Joint Resolution 188 was to address the pension system's lack of liquidity and insolvency and the need for increased funding to pay benefits owed by the ERS to retirees.  This could have been directly and lawfully accomplished by increasing employer contributions to the ERS within the existing statutory scheme.  However, as required by the Oversight Board, Joint Resolution 188 bypassed the ERS entirely and required employers to make increased employer contributions to the Commonwealth General Fund

---

[15] Financial Oversight and Management Board, Oversight Board Certifies Title III Filings (May 3, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/590a09096cd13.pdf.

[16] Financial Oversight and Management Board, Oversight Board Certifies Title III Filings (May 22, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/5923379dd9dfc.pdf.

[17] An unofficial English translation of Joint Resolution 188 is attached as Exhibit B.  The official Spanish version is available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/59591daabd5eb.pdf.

[18] The Oversight Board adopted House Resolution 186, House Resolution 187, and House Resolution 188 as part of the Commonwealth's budget pursuant to §§ 202(d)(2) and 202(e)(3) of PROMESA.  The Board "deemed" the budget, along with the various resolutions, "to be approved by the Governor and the Legislature" and "in full force and effect beginning on July 1, 2017."  Exhibit A to Letter from Financial Oversight and Management Board Letter to Governor Rosselló at 2 (June 30, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59591daabd5eb.pdf.  House Resolution 186 and House Resolution 187 address other matters related to the Commonwealth's budget, but they also include the full text of House Resolution 188.  To avoid repetition, the Complaint refers to House Resolution 188 only.

instead. The actual purpose and effect of Joint Resolution 188, then, was to confiscate plaintiffs' constitutionally-protected property interests in Pledged Property.

74. Joint Resolution 188 ordered the ERS to sell its assets and to transfer the net cash proceeds, in addition to any available funds, into the Puerto Rico Treasury Secretary's account as part of the General Fund for fiscal year 2017-2018 to make benefit payments to pensioners. Joint Resolution 188 §§ 1,2, 3.

75. Joint Resolution 188 also provided in relevant part that:

    a. the Commonwealth would assume any payments that Puerto Rico's retirement systems, including the ERS, could not make;

    b. the ERS would continue to meet its obligations to beneficiaries and pensioners by contributing its available funds and any funds arising from its asset sales to the Commonwealth's General Fund;

    c. the Commonwealth, its public corporations, and its municipalities would stop making employer contributions to the ERS;

    d. AAFAF would establish procedures so that the Commonwealth, its public corporations, and its municipalities would make employer contributions to the Commonwealth.

*Id.* § 4.

76. No consideration was provided to ERS Bondholders in exchange for the collateral transferred to the Commonwealth's General Fund.

77. Joint Resolution 188 was approved by the Puerto Rico legislature pursuant to the fiscal plan approved and certified by the Oversight Board. *Id.* § 4.

VII.  **LAW TO GUARANTEE PAYMENT TO OUR PENSIONERS AND ESTABLISH A NEW PLAN FOR DEFINED CONTRIBUTIONS FOR PUBLIC SERVANTS ("Act 106-2017").**

78.    To further implement the changes required by the fiscal plan, the Puerto Rico legislature passed Act 106-2017[19] on August 18, 2017, and the Governor signed it into law on August 23, 2017.

79.    Act 106-2017 established procedures for increasing employer contributions to make payments equal to the obligations to employees that were mandated by the fiscal plan and set forth in Joint Resolution 188.  The law declares that "as of July 1, 2017, in accordance with House Joint Resolution 188 of 2017, as certified by the Fiscal Oversight Board, on July 13, 2017 the Government of Puerto Rico became the direct payer of our retirees' pensions."  Act 106-2017, § 1.4.

80.    The Oversight Board directed the Commonwealth to enact Act 106-2017.  Indeed, the law explains:

- "This Law seeks to safeguard the wellbeing of our pensioners and public, while faithfully implementing the Fiscal Plan certified by the Oversight Board."  *Id.* at 5.

- "[I]t is . . . an indisputable fact that we have to work within the parameters of PROMESA to begin Puerto Rico's economic and fiscal recovery."  *Id*. at 4.

- "It is promulgated in order to adjust the legal and judicial framework so as to be able to meet the requirements demanded by the Oversight Board in the Fiscal Plan approved under Federal PROMESA Act."  *Id.*

---

[19] A certified copy of an unofficial English translation of Act 106-2017 is attached as Exhibit C.  The official Spanish version is available at http://www.oslpr.org/2017-2020/leyes/doc/ley-106-23-Ago-2017.doc.

- "PROMESA enjoys supremacy over any laws passed in the territory of Puerto Rico that are incompatible with the intent, responsibilities, missions and objectives of the federal law and the Oversight Board as the body in charge of implementing them." *Id*. at 8.

- "Specifically, this law is rooted in the provisions on pension reform in the Fiscal Plan, as set forth below," showing the effect of reform measures, such as "Contribution Segregation and New Benefits Plan" (increasing the amount of employer contributions to pay the full amount of benefits owed to retirees each year) and "Adjust Retirement Benefits":



*Id.* at 8.

81.    Act 106-2017 contains provisions that specify the mechanisms by which the Commonwealth will pay all of the benefits due to employees each year.  For example, it provides for the treatment and the payment terms of accumulated pensions and associated accounts. *id.*, at

ch. 2; establishes a defined contribution program, *id.* at ch. 3; creates a retirement board to replace the existing boards of the retirement systems, *id.* at ch. 4; provides transition rules, *id.* at ch. 5, and makes changes to existing laws, *id.* at ch. 6. The Act also reiterates that in accordance with Joint Resolution 188 the Commonwealth would assume any payments that the ERS could not make, *see* Act 106-2017, §§ 1.3, 1.4, that the ERS would contribute its assets to the Commonwealth, *id.*, and that the Commonwealth, its public corporations, and its municipalities would stop making employer contributions to the ERS, *id.*

82.     Act 106-2017 also states that unless an extension is granted the Board of Trustees for ERS is to be dissolved by December 31, 2017,  *id.* § 5.1(b), that the new retirement board will have the authority to dispose of all of ERS's property and equipment, *id.*, §§ 4.1 and 5.3, and that all of ERS's employees will be terminated and transferred to other posts, *id.* § 5.2.

## CLAIM FOR RELIEF

### *Just Compensation Under the Fifth Amendment*
### *For the Taking of Private Property*

83.     Plaintiffs repeat and reallege paragraphs 1 through 83.

84.     The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation" (the "Takings Clause"). U.S. CONST. amend. V.

85.     Plaintiffs possess a constitutionally-protected property interest in the form of valid and enforceable liens on Pledged Property and in the contractual right to timely payment of principal and interest by the ERS, Bond Resolution § 701 ("The [ERS] shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every Bond and the interest thereon . . . .").

24

86.    At all relevant times, the Oversight Board was an instrumentality of the United States government.

87.    Using its powers under PROMESA, the Oversight Board planned, prepared and imposed upon the Commonwealth of Puerto Rico a fiscal plan that, among other things, was intended to and did result in a taking of plaintiffs' property by directing and compelling the Commonwealth to enact laws and take actions to appropriate plaintiffs' property interest, including the contractual right to receive principal and interest due to plaintiffs.

88.    The Oversight Board, working with and acting through the Commonwealth, designed and approved Joint Resolution 188, directed and required the Commonwealth to enact it, and adopted it on behalf of the Governor. Joint Resolution 188 appropriated plaintiffs' property interest without just compensation, including the contractual right to receive principal and interest due to plaintiffs.

89.    The Oversight Board, working with and acting through the Commonwealth, designed and approved Act 106-2017 and directed and required the Commonwealth to enact it. Act 106-2017, in and of itself and in conjunction with Joint Resolution 188 appropriated plaintiffs' property interest without just compensation, including the contractual right to receive principal and interest due to plaintiffs.

90.    The taking of plaintiffs' property interest was direct federal action by the Oversight Board because the Board compelled the Commonwealth to adopt a fiscal plan that took plaintiffs' property and directed and required the Commonwealth to enact and implement Joint Resolution 188 and Act 106-2017.  This legislation required the ERS to liquidate its assets and pay the proceeds to the Commonwealth's General Fund, and divert the stream of employer

contributions from the ERS to the Commonwealth. Thus, the ERS was deprived of the funds necessary to pay the principal and interest due to plaintiffs, to which they had a contractual right.

91. The taking of plaintiffs' property interest also was direct federal action by the Oversight Board because the Board used the Commonwealth as its agent to serve its purposes of appropriating plaintiffs' property. As a result, the Oversight Board is responsible for the actions the Commonwealth took in furtherance of the Board's plan to expropriate plaintiffs' property.

92. Alternatively, the Commonwealth acted "under the authority of the Federal Government." *See, e.g.*, *Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 1996); *Hendler v. United States*, 952 F.2d 1364, 1377-78 (Fed. Cir. 1991). The Commonwealth was obliged to comply with the Oversight Board's directives under PROMESA, a federal statute, by enacting and implementing Joint Resolution and Act 106-2017. As a result, the United States is responsible for the actions the Commonwealth took in furtherance of the Board's plan to expropriate plaintiffs' property.

93. Plaintiffs are entitled to just compensation for the United States' taking of their property.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully pray for an order and judgment:

I. Awarding plaintiffs just compensation equal to payment of the principal amount of the ERS Bonds together with all interest accrued to the date of payment under the Fifth Amendment for the United States' taking of their property;

II. Granting plaintiffs their attorneys' fees and costs; and

III. Granting such further relief as the Court deems just and proper.

Respectfully submitted:     October 31, 2017

By:     /s/ Christopher J. DiPompeo
        Christopher J. DiPompeo
        *Counsel of Record*
        JONES DAY
        51 Louisiana Ave. N.W.
        Washington, DC 20001
        Tel. (202) 879-3939
        Fax: (202) 626-1700
        cdipompeo@jonesday.com

*Of Counsel:*

JONES DAY

Bruce Bennett
555 South Flower Street, 50th Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum
Victoria Dorfman
250 Vesey Street
New York, NY 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com
vdorfman@jonesday.com

Geoffrey S. Stewart
Beth Heifetz
Sparkle L. Sooknanan
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
bheifetz@jonesday.com
ssooknanan@jonesday.com