IN THE UNITED STATES COURT OF FEDERAL CLAIMS

17-970C
(Judge Hertling)

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC,
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY COMPANY,
CROWN MANAGED ACCOUNTS FOR AND ON BEHALF OF
CROWN/PW SP, GLENDON OPPORTUNITIES FUND, L.P.,
LMA SPC FOR AND ON BEHALF OF MAP 98 SEGREGATED
PORTFOLIO, MASON CAPITAL MASTER FUND LP,
NOKOTA CAPITAL MASTER FUND, L.P., OAKTREE-FORREST
MULTI-STRATEGY, LLC (SERIES B), OAKTREE OPPORTUNITIES
FUND IX, L.P., OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2),
L.P., OAKTREE VALUE OPPORTUNITIES FUND, L.P., OCEANA
MASTER FUND LTD., OCHER ROSE, L.L.C., PENTWATER
MERGER ARBITRAGE MASTER FUND LTD., PWCM MASTER
FUND LTD., AND SV CREDIT, L.P.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

DEFENDANT'S OPPOSITION TO MOTION TO FILE SECOND AMENDED COMPLAINT
AND CROSS-MOTION TO DISMISS

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:                                KENNETH M. DINTZER
                                           Deputy Director
JASON E. MORROW
Attorney Advisor                           CHRISTOPHER J. CARNEY
U.S. Department of the Treasury            Senior Litigation Counsel
                                           Commercial Litigation Branch
L. MISHA PREHEIM                           Civil Division
Assistant Director                         Department of Justice
                                           Attn: Classification Unit, 8th Floor
ALISON S. VICKS                            P.O. Box 480
Trial Attorney                             Ben Franklin Station
                                           Washington, D.C. 20044
                                           Tel: (202) 305-7597
                                           chris.carney@usdoj.gov

September 11, 2020                         Attorneys for Defendant

INTRODUCTION ................................................................................................... 1

QUESTIONS PRESENTED ................................................................................... 3

STATEMENT OF THE CASE ............................................................................... 4

   I.   Puerto Rico's Constitutional Status ................................................. 4

   II.   Congress's Uniform Control Over Municipal Bankruptcy Law ....................................... 5

   III.   The Employee Retirement System and the Issuance of the ERS Bonds ......................... 6

   IV.   The Puerto Rico Fiscal Crisis and the Enactment of PROMESA ................................. 8

   V.   The Board ............................................................................................ 9

   A.   The Establishment of the Board ...................................................... 9

   B.   The Post-Petition Legislation ........................................................ 10

   VI.   Title III Litigation Pursuant To PROMESA ................................... 11

   A.   Title III Petitions Are Filed ........................................................... 11

   B.   The *Section 552 Decision* ............................................................ 12

   C.   Additional Ongoing Proceedings Relating To The ERS Bonds ................................ 13

ARGUMENT .......................................................................................................... 14

   I.   Standards Of Review ...................................................................... 14

   II.   The Court Should Deny Plaintiffs' Motion To Amend Their Complaint A Second Time Because Such Amendment Would Be Futile ................................ 16

   III.   The Court Does Not Possess  Jurisdiction Over Plaintiffs' Takings Claim Regarding Legislation Enacted By The Government Of Puerto Rico ................................ 16

   A.   The Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Claim Because The Board Is Part Of The Government Of Puerto Rico ................................ 16

   B.   Plaintiffs' Alternative Theory Of Derivative Liability Is Meritless ................................ 20

   IV.   The Court Lacks Jurisdiction To Entertain Plaintiffs' Takings Claims Because Congress Has Placed Jurisdiction For Claims Arising Under PROMESA In The District Court.. 23

   V.   Plaintiffs' Takings Claims Are Not Ripe For Adjudication ................................ 25

VI.  Plaintiffs Fail To State A Claim Because The Application Of Section 552 To Plaintiffs' Claims Did Not Result In A Taking ............................................................................ 30

  A.  The First Circuit Held That The ERS Bondholders Possessed No Property Interest In The Employer Contributions Affected By Section 552 ................................................ 30

  B.  The First Circuit's Holding Regarding Plaintiffs' Lack Of A Property Interest Is Collateral Estoppel In These Proceedings ........................................................................ 33

  C.  Plaintiffs' Purported Property Interests Are Not The Type Protected By The Takings Clause ............................................................................................................................ 35

  D.  Even If Plaintiffs Possessed A Property Interest, Their Takings Claims Based On Section 552 Fail To Meet The *Penn Central* Requirements .......................................... 37

      1.  PROMESA Has Not Interfered With Plaintiffs' Reasonable Investment-Backed Expectations .......................................................................................................... 37

      2.  The Character Of The Government Action Weighs Heavily Against Finding A Taking ................................................................................................................... 42

      3.  Plaintiffs Cannot Demonstrate Economic Impact ................................................ 43

  VII.  Supreme Court And Federal Circuit Precedent Establishes That Mere Frustration Of A Contractual Expectancy Is Insufficient To Establish A Taking ................................. 44

  VIII.  The Independent Acts Of The Government Of Puerto Rico Cannot Be Attributed To The United States For Takings Purposes ........................................................................ 47

CONCLUSION ................................................................................................................ 50

## Table of Authorities

### Cases

*A & D Auto Sales, Inc. v. United States,*
748 F.3d 1142 (Fed. Cir. 2014) ................................................................. 40, 43

*Acceptance Ins. Cos., Inc. v. United States,*
583 F.3d 849 (Fed.Cir.2009) ................................................................. 15

*Air Pegasus of D.C., Inc. v. United States,*
424 F.3d 1206 (Fed. Cir. 2005) ................................................................. 30, 46

*Almota Farmers Elevator & Warehouse Co. v. United States,*
409 U.S. 470, (1973) ................................................................. 30

*Alpine PCS, Inc. v. United States,*
878 F.3d 1086 (Fed. Cir. 2018) ................................................................. 24

*Altair Glob. Credit Opportunities Fund (A), LLC v. United States,*
138 Fed. Cl. 742 (2018) ................................................................. 18, 19, 25

*Am. Bankers Ass'n v. United States,*
932 F.3d 1375 (Fed. Cir. 2019) ................................................................. 30, 31

*Appolo Fuels, Inc. v. United States,*
381 F.3d 1338 (Fed. Cir. 2004) ................................................................. 42

*Armstrong v. United States,*
364 U.S. 40 (1960) ................................................................. 36

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 15, 33, 50

*Atlas Corp. v. United States,*
895 F.2d 745 (Fed. Cir. 1990) ................................................................. 44

*Aviation & Gen. Ins. Co., Ltd. v. United States,*
882 F.3d 1088 (Fed. Cir.) ................................................................. 41, 42

*B & G Enters., Ltd. v. United States,*
220 F.3d 1318 (Fed. Cir. 2000) ................................................................. 48, 49, 50

*Banner v. United States,*
238 F.3d 1348 (Fed. Cir. 2001) ................................................................. 33, 34, 35

*Belk v. United States,*
858 F.2d 706 (Fed. Cir. 1988) ................................................................. 41, 42

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................................. 15

*Board of Regents of State Colleges v. Roth,*
  408 U.S. 564 (1972) .................................................................................................. 30

*Brown v. Legal Found. of Washington,*
  538 U.S. 216 (2003) .................................................................................................. 44

*Brown v. United States,*
  No. 19-671C, 2019 WL 5681549 (Fed. Cl. Nov. 1, 2019) ...................................... 18

*Butz Engineering Corp. v. United States,*
  204 Ct. Cl. 561, 499 F.2d 619 (1974) ...................................................................... 18

*Cano Martin Pena v. Fortuno,*
  604 F.3d 7 (1st Cir. 2010) ........................................................................................ 22

*Carrasquillo v. Aponte Roque,*
  682 F. Supp. 137 (D.P.R. 1988) ............................................................................... 32

*Cienega Gardens v. United States,*
  503 F.3d 1266 (Fed. Cir. 2007) ................................................................................ 38

*Commonwealth Edison Co. v. United States,*
  271 F.3d 1327 (Fed.Cir.2001) ............................................................................. 38, 42

*Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California,*
  508 U.S. 602 (1993) .................................................................................................. 38

*Connolly v. Pension Ben. Guar. Corp.,*
  475 U.S. 211 (1986) ............................................................................................. 38, 43

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.,*
  18 F.3d 1581 (Fed. Cir. 1994) .................................................................................. 23

*Cont'l Ill. Nat'l Bank & Trust Co. v. Chi., Rock Island & Pac. Ry.,*
  294 U.S. 648 (1935) .................................................................................................... 5

*Deniz v. Municipality of Guaynabo,*
  285 F.3d 142 (1st Cir. 2002) .................................................................................... 22

*E. Enterprises v. Apfel,*
  524 U.S. 498, 517 (1998) ..................................................................................... 36, 37

*El Paso & Ne. Ry. Co. v. Gutierrez,*
  215 U.S. 87 (1909) ...................................................................................................... 5

*Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*,
   426 U.S. 572 (1976) ................................................................................ 21, 22

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv.*, LLC,
   140 S. Ct. 1649 (2020) ..................................................................... *passim*

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,
   18 B.R. 868 (Bankr. D. Colo. 1982) ....................................................... 32, 36

*Foman v. Davis*,
   371 U.S. 178, (1962) ...................................................................................... 14

*Forest Props., Inc. v. United States*,
   177 F.3d. 1360 (Fed. Cir. 1999) ................................................................... 43

*Franklin California Tax-Free Tr. v. Puerto Rico*,
   85 F. Supp. 3d 577 (D.P.R. 2015) ........................................................... 39, 40

*Franklin California Tax-Free Tr. v. Puerto Rico*,
   805 F.3d 322 (1st Cir. 2015) ............................................................... 6, 39, 40

*Golden v. United States*,
   955 F.3d 981 (Fed. Cir. 2020) ...................................................................... 16

*Gov't of Guam v. Moylan*,
   407 F.2d 567 (9th Cir. 1969) ........................................................................ 22

*Grafton v. United States*,
   206 U.S. 333 (1907) ...................................................................................... 21

*Green v. United States*,
   229 Ct. Cl. 812 (1982). ............................................................................ 17-18

*Griggs v. Allegheny County, Pa.*,
   369 U.S. 84 (1962) ........................................................................................ 48

*HCIC Enterprises, LLC v. United States*,
   No. 18-1943C, 2020 WL 4197996 (Fed. Cl. July 9, 2020) ........................ 14

*Hendler v. United States*,
   175 F.3d 1374 (Fed.Cir.1999) ...................................................................... 44

*Hendler v. United States*,
   952 F.2d 1364 (Fed. Cir. 1991) .................................................................... 49

*Henke v. United States*,
   60 F.3d 795 (Fed. Cir. 1995) .................................................................... 4, 15

*Hinck v. United States*,
   550 U.S. 501 (2007) .................................................................................... 25

*Holley v. United States*,
   124 F.3d 1462 (Fed. Cir. 1997) ................................................................... 15

*Horne v. Dep't of Agric.*,
   569 U.S. 513 (2013) .................................................................................... 24

*Huntleigh USA Corp. v. United States*,
   525 F.3d 1370 (Fed. Cir. 2008) ................................................................... 46

*In re Chateaugay Corp.*,
   53 F.3d 478 (2d Cir. 1995) .......................................................................... 37

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   948 F.3d 457 (1st Cir. 2020) ................................................................. *passim*

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   385 F. Supp. 3d 138 (D.P.R. 2019) ............................................................. 12

*Indium Corp. of America v. Semi-Alloys, Inc.*,
   781 F.2d 879 (Fed. Cir. 1985) ..................................................................... 15

*Int'l Shoe Co. v. Pinkus*,
   278 U.S. 261 (1929) ...................................................................................... 5

*Kam-Almaz v. United States*,
   682 F.3d 1364 ............................................................................................. 15

*Keystone Bituminous Coal Assn. v. DeBenedictis*,
   480 U.S. 470 (1987) .................................................................................... 29

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995) .................................................................................... 18

*Leider v. United States*,
   301 F.3d 1290 (Fed. Cir. 2002) ................................................................... 16

*Local Loan Co. v. Hunt*,
   292 U.S. 234 (1934) .................................................................................... 36

*Louisville Joint Stock Land Bank v. Radford*,
   295 U.S. 555 (1935) .................................................................................... 36

*Murr v. Wisconsin*,
   137 S. Ct. 1933 (2017) ................................................................................ 29

*New York Cent. R.R. v. White*,
   243 U.S. 188 (1917) ................................................................ 41

*Norman v. United States*,
   429 F.3d 1081 (Fed. Cir. 2005) .............................................. 37

*Omnia Commercial Co. v. United States*,
   261 U.S. 502 (1923) .......................................................... 45, 46

*Palmore v. United States*,
   411 U.S. 389 (1973) ................................................................ 19

*Palmyra Pac. Seafoods, L.L.C. v. United States*,
   561 F.3d 1361 (Fed. Cir. 2009) .............................................. 45

*Penn Central Transportation Co. v. City of New York*,
   438 U.S. 104 (1978) ................................................... 37, 42, 43

*People of Puerto Rico v. Eastern Sugar Assocs.*,
   156 F.2d 316 (1st Cir. 1946) .................................................. 22

*Phillips v. Washington Legal Found.*,
   524 U.S. 156 (1998) ................................................................ 30

*Piszel v. United States*,
   833 F.3d 1366 (Fed. Cir. 2016) .............................................. 47

*Preseault v. United States*,
   100 F.3d 1525 (Fed. Cir. 1996) .............................................. 49

*Puerto Rico v. Franklin California Tax-Free Tr.*,
   136 S. Ct. 1938 (2016) .............................................. 6, 39, 40, 41

*Puerto Rico v. Sanchez Valle*,
   136 S. Ct. 1863 (2016) .................................................. 5, 21, 22

*Redondo-Borges v. HUD*,
   421 F.3d 1 (1st Cir. 2005) ...................................................... 32

*Reynolds v. Army & Air Force Exch. Serv.*,
   846 F.2d 746 (Fed. Cir. 1988) ................................................ 15

*Rick's Mushroom Serv., Inc. v. United States*,
   521 F.3d 1338 (Fed. Cir. 2008) .............................................. 25

*Rodriguez v. Popular Democratic Party*,
   457 U.S. 1 (1982) .................................................................... 5

*Rogers v. United States,*
  814 F.3d 1299 (Fed. Cir. 2015) ............................................................ 30

*Ruckelshaus v. Monsanto,*
  467 U.S. 986 (1984) ................................................................. 37, 42

*Shelden v. United States,*
  742 Fed. Appx. 496 (Fed. Cir. 2018)........................................... 20

*Shewfelt v. United States,*
  104 F.3d 1333 (Fed. Cir. 1997) ............................................... 49

*Shinnecock Indian Nation v. United States,*
  782 F.3d 1345 (Fed. Cir. 2015) .......................................... 25, 26, 27

*Sims v. Jamison,*
  67 F.2d 409 (9th Cir. 1933) ...................................................... 32

*Slattery v. United States,*
  635 F.3d 1298 (Fed. Cir. 2011) ............................................... 17

*Soto-Rios v. Banco Popular de P.R.,*
  662 F3d 112 (1st Cir. 2011) ....................................................... 32

*St. Bernard Par. Gov't v. United States,*
  916 F.3d 987 (Fed. Cir. 2019) ................................................. 21

*Sys. Application & Techs., Inc. v. United States,*
  691 F.3d 1374 (Fed. Cir. 2012) ............................................... 26

*Taylor v. United States,*
  959 F.3d 1081 (Fed. Cir. 2020) ............................................... 37

*Tex. Peanut Farmers v. United States,*
  409 F.3d 1370 (Fed. Cir. 2005) ............................................... 21

*Trusted Integration, Inc. v. United States,*
  659 F.3d 1159 (Fed. Cir. 2011) ............................................... 15

*United States v. Bekins,*
  304 U.S. 27 (1938) ........................................................................ 5

*United States v. Sec. Indus. Bank,*
  459 U.S. 70 (1982) ...................................................................... 36

*United States v. Sherwood,*
  312 U.S. 584 (1941) ...................................................... 16, 17, 20

*United States v. Testan*,
    424 U.S. 392 (1976) .................................................................. 16, 17, 25

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976) ............................................................................. 38

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
    449 U.S. 155 (1980) .......................................................................... 31

*Weinberger v. Salfi*,
    422 U.S. 749 (1975) .......................................................................... 24

*Wilson ex rel. Estate of Wilson v. United States*,
    405 F.3d 1002 (Fed. Cir. 2005) ...................................................... 24

*Wyatt v. United States*,
    271 F.3d 1090 (Fed. Cir. 2001) ...................................................... 30

## **Statutes**

3 L.P.R.A. § 761 .......................................................................................... 6

3 L.P.R.A. § 779(d) ..................................................................................... 7

3 L.P.R.A. § 787f ......................................................................................... 7

3 L.P.R.A § 775 ........................................................................................... 6

11 U.S.C. § 552 .................................................................................. *passim*

11 U.S.C. § 903(1) ................................................................................. 6, 39

11 U.S.C. §§ 901 .................................................................................. 6, 12

28 U.S.C. § 1491(a)(1) ............................................................................. 17

42 U.S.C. § 1983 ....................................................................................... 22

48 U.S.C. § 2101 ......................................................................................... 8

48 U.S.C. § 2104(19) ............................................................................... 11

48 U.S.C. § 2121(a) ..................................................................................... 9

48 U.S.C. § 2121(b)-(c) ............................................................................ 17

48 U.S.C. § 2121(c) ..................................................................................... 9

48 U.S.C. § 2121(e)(1)(A) .......................................................................... 9

48 U.S.C. § 2126(a) ........................................................................................ 8, 23

48 U.S.C. § 2145(a) ............................................................................................. 49

48 U.S.C. § 2145(b) ............................................................................................. 49

48 U.S.C. § 2150 .................................................................................................. 37

48 U.S.C § 2161(a) ............................................................................................... 12

48 U.S.C. § 2168 .................................................................................................. 11

48 U.S.C. § 2174 .................................................................................................. 29

48 U.S.C. § 2194(m) ....................................................................................... 8, 43

48 U.S.C. §§ 2121-2129 ........................................................................................ 8

48 U.S.C. §§ 2141-2152 ........................................................................................ 9

48 U.S.C. §§ 2161-2177 ........................................................................................ 9

Pub. L. No. 114-187 .............................................................................................. 8

## **Rules**

RCFC 12(b)(1) ..................................................................................................... 15

RCFC 12(b)(6) ..................................................................................................... 15

## **Other Authorities**

Petition for Writ of Certiorari, *Andalusian Global Designated Activity Co v. The Financial Oversight and Management Board for Puerto Rico*, 2020 WL 4569211 .......................... 13, 26

Brief of the United States, *Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC,* 2019 WL 3408807 (U.S.) ............................................... 19

Restatement (Third) of Trusts § 41 (Am Law. Inst. 2003) ........................................ 32

Pursuant to Rules 12(b)(1), 12(b)(6), and 15 of the Rules of the United States Court of Federal Claims (RCFC) and this Court's orders of June 11, 2020 (ECF No. 71) and September 3, 2020 (ECF No. 78), defendant, the United States, respectfully requests that the Court deny the motion for leave to file a second amended complaint, and cross-moves to dismiss the complaint of plaintiffs.  The Court does not possess jurisdiction to entertain plaintiffs' proposed complaint for several independently sufficient reasons, so amending the complaint would be futile.  Even if this Court should determine it possesses jurisdiction, the proposed complaint fails to state claims upon which relief can be granted, also making amendment futile and dismissal warranted.

## INTRODUCTION

This case arises from the economic crisis that is gripping the Commonwealth of Puerto Rico, which has accumulated more than $100 billion in combined debt and unfunded pension liabilities, while its population has rapidly declined.  Since the filing of this case, the island has been further devastated from the impact of Hurricane Maria and the effects of a global pandemic.

In response to the economic crisis, Congress, exercising its plenary authority over United States territories pursuant to Article IV of the United States Constitution, enacted the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) to establish a comprehensive framework under which Puerto Rico could return itself to financial stability.  One aspect of PROMESA was the creation of a financial oversight and management board (the Board) within the Puerto Rico government, to assist the Commonwealth in its financial recovery efforts.  The law also established an orderly legal process, known as Title III, which incorporated provisions from Chapter 9 of the Bankruptcy Code, to allow creditors to pursue claims against the Commonwealth and its instrumentalities.

Through this action, numerous hedge funds seek via a takings claim to make the United States bear the responsibility for the funds' own investment gambles. Plaintiffs claim ownership to certain bonds issued by the Employee Retirement System of Puerto Rico (ERS). Though plaintiffs are currently pursuing claims based upon those bonds—including takings claims— against ERS and the Commonwealth in the Title III proceedings, they have filed a takings claim against the United States here, based on those same bonds.

Plaintiffs now seek to amend their complaint to add two additional takings claims based on an adverse First Circuit decision (which they have petitioned the Supreme Court to review). Their motion should be denied as futile and the first amended complaint should be dismissed. Alternatively, if leave to amend is granted, the Court should dismiss the second amended complaint for lack of jurisdiction and failure to state a claim.

First, the Court does not possess jurisdiction over the original takings count, because the defendant in this Court is always the United States, and Congress has expressly declared that the Board is not part of the Federal Government, and is instead part of the government of Puerto Rico. The Supreme Court ruled earlier this year that Congress "succeeded" in its effort to make the Board part of the Commonwealth government. Thus, plaintiffs must pursue any remedies against the Commonwealth, which they are already doing. Second, the Court does not possess jurisdiction because Congress has expressly provided that any suits arising in whole or in part under PROMESA must be brought in the district court in Puerto Rico. Third, even if the Court possessed jurisdiction, plaintiffs' takings claims are not ripe for adjudication because the ERS bondholders are seeking to recover the full value of their bonds in the Title III proceedings.

But even if the Court determines that (1) the Board is a component of the Federal government (contrary to Congress and the Supreme Court), (2) jurisdiction is not precluded by

PROMESA, and (3) the takings claims are ripe for adjudication, the Court should nonetheless dismiss this action for failure to state a claim upon which relief may be granted. The First Circuit has already held that plaintiffs possessed no property interest in the contingent pension contributions they allege were taken by Congress's incorporation of Chapter 9 provisions into PROMESA. Moreover, even if plaintiffs possessed a property interest, they fail on each of the Supreme Court's *Penn Central* factors to establish a regulatory taking. Further, their claims that the United States took their contract rights fail as a matter of law. Supreme Court precedent establishes that the mere frustration of a contractual expectancy, such as payments under a bond contract, is insufficient to establish a taking. Finally, even if the Board requested the enactment of particular legislation by Puerto Rico and the Board's request could somehow be ascribed to the United States, the Federal Government cannot be held liable for the independent decision of Puerto Rico's legislature and governor to accede to the request and enact legislation.

<u>QUESTIONS PRESENTED</u>

1.    Whether leave to amend a complaint should be granted, when amendment would be futile because the proposed complaint is outside the Court's jurisdiction and fails to state a claim upon which relief can be granted.

2.    Whether the Court possesses jurisdiction to entertain a takings claim premised upon the actions of the Board, notwithstanding that Congress expressly created the Board as an entity within the Government of Puerto Rico, as recently recognized by the Supreme Court.

3.    Whether the Court possesses jurisdiction to entertain takings claims arising from the application of PROMESA to the plaintiff's purported security interests, when Congress has expressly provided that any actions arising in whole or in part under PROMESA, must be brought in district court.

4.      Whether plaintiffs' takings claim regarding amounts allegedly due them under the ERS bonds is ripe for adjudication, when plaintiffs are currently litigating how much they are allegedly entitled to receive for their ERS bonds in the PROMESA Title III proceedings.

5.      Whether plaintiffs can state a takings claim in the absence of a property interest in future contingent employee contributions.

6.      Whether plaintiffs can state a takings claim regarding the application of Section 552 of the Bankruptcy Code to their purported security interest when they can show no reasonable investment-backed expectation in the long-standing municipal bankruptcy law not being applied to Puerto Rico municipalities, where the incorporation of Section 552 into PROMESA was part of a larger effort to save the economy of Puerto Rico from collapse, and plaintiffs can show no economic impact from the statute's application.

7.      Whether plaintiffs fail to state a takings claim, when their claim is based upon contractual expectations under the ERS bonds.

8.      Whether plaintiffs fail to state a takings claim, when their claim is based upon independent legislative acts of the legislature and governor of Puerto Rico.

<u>STATEMENT OF THE CASE</u>

I.      <u>Puerto Rico's Constitutional Status</u>

The Commonwealth of Puerto Rico is a territory of the United States.  Compl., ¶ 27.[1]
Congress is granted the authority under Article IV of the Constitution to make "needful Rules

---

[1]  "Complaint" or "Compl." refers to plaintiffs' second amended and supplemented complaint, which the Court has conditionally permitted plaintiffs to file to establish it as the operative complaint for our motion to dismiss.  Sept. 3, 2020 Order (ECF No. 78).  The Court has still permitted the Government the opportunity to oppose amendment.  *Id.*  Unless otherwise noted, the facts described here are taken from the complaint or from official public sources. Facts derived from plaintiffs' complaint are accepted as true solely for the purposes of this motion to dismiss.  *See, e.g., Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

and Regulations respecting [a] Territory." U.S. Const. art. IV, § 3, cl. 2. The Constitution grants

Congress "plenary power . . . over the territories of the United States." *El Paso & Ne. Ry. Co. v.*

*Gutierrez*, 215 U.S. 87, 93 (1909). This frees Congress "to develop innovative approaches to

territorial governance" that are tailored to each territory's needs. *Puerto Rico v. Sanchez Valle*,

136 S. Ct. 1863, 1876 (2016). "Having a right to erect a territorial government, [Congress] may

confer on it such powers, legislative, judicial, and executive, as they may deem best." 3 Joseph

Story, *Commentaries on the Constitution of the United States* § 1319, at 195 (1833).

In 1950, Congress passed legislation inviting the people of Puerto Rico to "organize a

government pursuant to a constitution of their own adoption." *Sanchez Valle*, 136 S. Ct. at 1876

(quoting 64 Stat. 319, 319 (1950)). Since that time, Puerto Rico has operated as "an autonomous

political entity, sovereign over matters not ruled by the [United States] Constitution." *Rodriguez*

*v. Popular Democratic Party*, 457 U.S. 1, 8 (1982) (quotation marks omitted). The

Commonwealth's governor, who is directly elected by the people of Puerto Rico, wields "[t]he

executive power" and is charged with "execut[ing] the laws and caus[ing] them to be executed."

P.R. Const. art. IV, §§ 1, 4. And the Commonwealth's legislature, whose members are also

elected, wields "[t]he legislative power" to enact civil and criminal laws. *Id*. art. III, § 1.

II.       Congress's Uniform Control Over Municipal Bankruptcy Law

The Bankruptcy Clause of the United States Constitution provides: "Congress shall have

Power . . . [t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United

States." U.S. Const. art. I, § 8, cl. 4. Such power "is unrestricted and paramount." *Int'l Shoe*

*Co. v. Pinkus*, 278 U.S. 261, 265 (1929). This power allows Congress to establish bankruptcy

procedures for a State's instrumentalities, *United States v. Bekins*, 304 U.S. 27, 50-51 (1938),

even if those procedures impair contractual obligations, *see Cont'l Ill. Nat'l Bank & Trust Co. v.*

*Chi., Rock Island & Pac. Ry.*, 294 U.S. 648, 680-81 (1935) (impairment of contracts "necessarily results from the nature of the [bankruptcy] power").

Congress enacted the first municipal bankruptcy law in 1933 in response to the Great Depression and the dire need for municipalities to have a means to restructure their debts. *Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 328 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016). The bankruptcy procedures applicable to municipalities now appear in Chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 et seq. Chapter 9 provides that an eligible "municipality"—defined to include the "public agenc[ies] or instrumentalit[ies] of a State," *id*. § 101(40)—may seek to adjust its debts by filing a restructuring plan in bankruptcy court. *See id*. § 941. Since 1946, Congress has expressly preempted state municipal bankruptcy laws. *See Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1944-5 (2016). That express preemption provision is now codified in Chapter 9. *See* 11 U.S.C. § 903(1).

Federal bankruptcy law has defined Puerto Rico as a "State" since it was first established as a territory of the United States in 1898. *Franklin California Tax-Free Tr.*, 136 S. Ct. at 1945. Puerto Rico is a "State" for *all* purposes of the Bankruptcy Code, *including* Chapter 9, with the exception that Puerto Rico is not empowered to "specifically authorize" its municipalities to seek Chapter 9 relief. *Id*. at 1946. Thus, the express preemption provision in Chapter 9 bars Puerto Rico from enacting its own municipal bankruptcy laws, just like any state. *See id*. at 1949.

III.    The Employee Retirement System and the Issuance of the ERS Bonds

ERS is a trust established by Puerto Rico in 1951 to pay retirement, disability, and other benefits to public employees of the Commonwealth. *See* 3 L.P.R.A. § 761; Complaint, ¶ 32. The ERS is "organized as an agency of the Government of Puerto Rico, independent and separate from others." 3 L.P.R.A § 775; Complaint, ¶ 32. Until a new law enacted by the

6

legislature of Puerto took effect in July 2017, ERS was primarily funded by contributions from employers. Complaint, ¶ 33. The amount that employers were to contribute was established by statute, which was subject to amendment by the legislature. *See* 3 L.P.R.A. § 787f.

The enabling act for ERS gave the ERS Board of Trustees authority to issue debt and to secure the issued debt with the assets of ERS. Complaint, ¶ 32.[2] On January 24, 2008, the ERS Board of Trustees issued senior and subordinate pension funding bonds pursuant to a resolution. *See* Complaint, ¶¶ 38-39 & Exhibit A. The aggregate principal amount of the bonds at issuance was approximately $2.9 billion. *See* Complaint, ¶ 41 & Exhibit A. The net proceeds from the bond issue were either used to pay pensioner benefits or invested to provide funds for future benefits. Complaint, ¶ 42. The bonds were intended to be secured, as set forth in the bond resolution. *See* Complaint, Exhibit A at VI-8 (describing security interest in "Pledged Property"); at VI-33, 36-37 (defining "Employers' Contributions, "Revenues," and "Pledged Property," respectively); *see also* Complaint, ¶¶ 46-51 (characterizing security interest described in accompanying bond resolution).

The Bond Resolution contemplated the possibility that ERS might one day need to distribute its assets in bankruptcy or insolvency proceedings. *See* Complaint, Exhibit A at VI-24 ("Upon any payment or distribution of assets of the System upon any dissolution or winding up or total or partial liquidation of the System whether in bankruptcy, insolvency or receivership proceedings, or otherwise . . . ."). The Bond Resolution required as part of the execution by ERS, and authentication by the Fiscal Agent, of the ERS bonds issued under it that an opinion of legal counsel be provided. *See id.* at VI-3 (Section 202(3)(ii)). Bond counsel was to attest to the

---

[2]     The authority of ERS to issue debt was substantially altered in 2011, in response to the economic crisis confronting Puerto Rico and the massive cash flow deficit faced by ERS. 3 L.P.R.A. § 779(d).

legality and enforceability of the ERS bonds, including the security interest created in the "Pledged Property," "*except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore <u>or thereafter enacted</u>.*"  *See id*. (emphasis added).

On January 31, 2008, Bond Counsel for ERS provided the legal opinion required by the Bond Resolution, which ERS delivered to prospective purchasers.  *See id*. at VIII-1-VIII-4.  In that opinion, Bond counsel stated that, "in rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights . . . ."  *See id*. at VIII-4.

IV.    The Puerto Rico Fiscal Crisis and the Enactment of PROMESA

PROMESA was signed into law by the President on June 30, 2016.  Pub. L. No. 114-187, 130 Stat. 549 (codified at 48 U.S.C. § 2101 *et. seq.* (2016)).  Congress described in PROMESA the economic emergency that prompted the law's passage.  These included "[a] combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."  48 U.S.C. § 2194(m).

In PROMESA, Congress created a comprehensive framework to resolve Puerto Rico's fiscal crisis through two main mechanisms.  First, in Title I of PROMESA, the Board is established within the Puerto Rican government pursuant to Article IV of the United States Constitution.  *See* 48 U.S.C. §§ 2121-2129.  Title I provides (with two exceptions not relevant here) that "any action against the [] Board, and any action otherwise arising out of [PROMESA], *in whole or in part*, shall be brought" in the United States District Court for the District of Puerto Rico.  *Id*. at  § 2126(a) (emphasis added).[3]

---

[3]    Because PROMESA can be applied to other territories, the language of the statute speaks to "a United States district court for the covered territory." *Id*.

The responsibilities of the Board are set forth in Title II of PROMESA.  These responsibilities generally include approving the Puerto Rico government's fiscal plans and budgets, making non-binding recommendations on actions that the Commonwealth can take to comply with those plans and budgets, and reporting on Puerto Rico's progress towards economic stability.  *See id.* at §§ 2141-2152.

Title III of PROMESA establishes a comprehensive restructuring scheme for Puerto Rico's debt that incorporates numerous provisions from the United States Bankruptcy Code.  *See id.* at §§ 2161-2177.  In addition, this title establishes a complete judicial framework, including jurisdictional and venue provisions, for carrying out these restructuring efforts.  *See id.* at §§ 2164-2170.  Jurisdiction for Title III cases is in the United States district courts, and in the case of Puerto Rico, venue is in the district court in Puerto Rico.  *Id.* at §§ 2166-2167.

     V.     <u>The Board</u>

          A.     <u>The Establishment of the Board</u>

PROMESA established a seven-member Board "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a), (b) (1), (e)(1)(A).  The Board consists of seven members appointed by the President on August 31, 2016, pursuant to PROMESA.  Compl. at ¶ 49 (citing 48 U.S.C. § 2121(e)(1)(A)).

PROMESA dictates that the Board would "'be created as an entity within the territorial government' of Puerto Rico," and that the board "'shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government.'"  *Id.* at ¶ 58 (citing 48 U.S.C. § 2121(c)).  The United States Supreme Court recently held that the Board is empowered as an instrumentality of Puerto Rico.  *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv.*, LLC, 140 S. Ct. 1649, 1661 (2020) ("Congress did not simply state that the Board is part of

the local Puerto Rican government.  Rather, Congress also gave the Board a structure, a set of duties, and related powers all of which are consistent with this statement.").

                 B.      <u>The Post-Petition Legislation</u>

Plaintiffs allege that the Board made a concerted effort "to work[] with and through the Commonwealth to make changes to the pension system to take the Pledged Property belonging to plaintiffs and divert it, without compensation to ERS Bondholders, to the Commonwealth." Compl. ¶¶ 82-83.  Joint Resolution 188, the allegedly unconstitutional Puerto Rico legislation, "was approved by the Puerto Rico legislature pursuant to the fiscal plan approved and certified by the [] Board."  *Id*., ¶¶ 93-98.

Plaintiffs assert, "Joint Resolution 188 bypassed ERS entirely and required employers to make increased employer contributions to the Commonwealth General Fund instead."  *Id*.  The resolution also "orders ERS to sell its assets and to transfer the net cash proceeds, in addition to any available funds, into the Puerto Rico Treasury Secretary's account as part of the General Fund for fiscal year 2017-2018 to make benefit payments to pensioners."  *Id*., ¶ 95.  Plaintiffs also assert that in August 2017, the Puerto Rico legislature passed and the Governor signed into law Act 106-2017, which further appropriated plaintiffs' property.  *Id*., ¶¶ 99-103, 89-90. According to plaintiffs, Joint Resolution 188 and Act 106-2017 (collectively the "post-petition legislation") "required ERS to liquidate its assets and pay the proceeds to the Commonwealth's General Fund and divert the stream of employer contributions from the ERS to the Commonwealth."  *Id*., ¶ 112.  They allege that the governor and legislature enacted this legislation at the Board's direction.  *Id*. at ¶ 101.

VI.    Title III Litigation Pursuant To PROMESA

    A.    Title III Petitions Are Filed

On May 3, 2017, the Board approved and certified the filing of a Title III petition for the Commonwealth pursuant to PROMESA.  *Id.*, ¶ 84.  Two days later, Chief Justice Roberts exercised his authority under PROMESA (48 U.S.C. § 2168), to designate the Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, as the presiding judge in the Commonwealth's Title III case in the United States District Court for the District of Puerto Rico.  *See* Designation of Presiding District Judge Under Title 48 § 2168, *In re Commonwealth of Puerto Rico* (No. 17-03283) (entered D.P.R. May 5, 2017) (A1).[4]

The Board also approved and certified the filing of a separate Title III petition for ERS, on May 21, 2017.  Complaint, ¶ 85.  Because ERS is an instrumentality of Puerto Rico, *see* 48 U.S.C. § 2104(19) (defining "territorial instrumentality"), the Chief Judge of the United States Court of Appeals for the First Circuit chose the district court judge to preside over ERS's Title III proceedings.  *See id.* at § 2168(b).  Judge Swain was also chosen to preside over ERS's Title III proceedings.  *See* Designation of Presiding District Judge Under Title 48 § 2168(b), *In re Commonwealth of Puerto Rico* (No. 17-03566) (entered D.P.R. May 23, 2017) (A2).  Numerous proceedings relating to Puerto Rico and its instrumentalities' respective Title III petitions are pending before Judge Swain.

In July 2017, the Board filed a declaratory judgment action against the ERS bondholders, including plaintiffs here.  *See* Adversary Complaint, *Financial Oversight and Management Board for Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC* (No. 17-03566) (Adversary No. 17-00213. 21) (filed D.P.R. July 21, 2017) (A3-35) (Oversight Board Adversary

---

[4]    "A__" refers to the page of the appendix accompanying this motion.

Complaint).  The ERS bondholders then filed their own adversary complaint.  *See* Amended ERS

Bondholder Adversary Complaint, *Altair Global Credit Opportunities Fund (A), LLC v.*

*Commonwealth of Puerto Rico* (No. 17-03566) (filed D.P.R. Nov. 8, 2017) (A36-77).

        B.        The *Section 552 Decision*

PROMESA incorporated dozens of sections of the Bankruptcy Code by reference.  *See*

48 U.S.C § 2161(a).  Among the incorporated sections is Section 552.  *See id*. (incorporating 11

U.S.C. § 552).  Under Section 552 "any property acquired postpetition by the Title III debtor is

not subject to any prepetition liens, unless an exception applies."  *See In re Fin. Oversight &*

*Mgmt. Bd. for P.R.*, 948 F.3d 457, 463 (1st Cir. 2020) (the "*Section 552 Decision*").  Section 552

also applies to municipal bankruptcies under Chapter 9.  *See* 11 U.S.C. § 901 (incorporating 11

U.S.C. § 552).

ERS sought declaratory relief in the Title III proceedings as to the validity of the ERS

Bondholders' purported security interest in ERS's post-petition assets, including employer

contributions that were received post-petition.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto*

*Rico,* 385 F. Supp. 3d 138, 147-48 (D.P.R. 2019), *aff'd*, 948 F.3d 457 (1st Cir. 2020).  The Title

III court agreed with ERS that Section 552 precluded any security interest from attaching to

revenues received by ERS post-petition, and no exceptions applied.  *See id*. at 147-52.

The First Circuit affirmed the Title III court's decision.  *Section 552 Decision*, 948 F.3d

at 477.  The First Circuit held that ERS's "statutory authority to receive postpetition Employers'

Contributions constituted merely an expectancy *and not a property 'right'* as it is clear that the

payment and the amounts of the Contributions depended on work occurring on and after the

petition date."  *Id*. at 468 (emphasis added).  At the time the Title III petition was filed, employer

contributions to ERS based on work performed *after* the petition was filed could not be

determined.  *Id.*  The Court held that those contributions were not due prepetition "*and the Bondholders did not have any security interest in such contributions*."  *Id*. (emphasis added). The Court also rejected the ERS Bondholders argument that they had a lien on employers' obligation to pay down ERS's deficits, because no such obligation exists.  *Id*. at 470-71.

The ERS Bondholders petitioned the First Circuit for rehearing *en banc*, which the Court denied on March 3, 2020.  The ERS Bondholders petitioned the Supreme Court for certiorari on July 31, 2020.  *See* Petition for Writ of Certioari, *Andalusian Global Designated Activity Co v. The Financial Oversight and Management Board for Puerto Rico* (*Section 552* Cert. Pet.), 2020 WL 4569211 (U.S.).  That petition is still pending.

C.    Additional Ongoing Proceedings Relating To The ERS Bonds

Following the First Circuit's *Section 552 Decision*, the parties—including plaintiffs[5] here—have continued litigating the numerous remaining claims in the ERS Title III proceedings.[6]  In March 2020, the ERS Bondholders supplemented the claims contained in their adversary complaint and in the administrative expense motion that they filed in November 2019. *See* ERS Bondholders' Supplement to Proofs of Claim, *In re Fin. Oversight and Mgmt. Bd. for*

---

[5]    That is, with the possible exception of plaintiffs such as Altair and Nokota, who apparently were able to sell all of their ERS bond holdings, despite the alleged "taking," and are no longer listed as plaintiffs in the Title III proceedings or identified as a secured creditor of ERS.  Meanwhile, other bondholder plaintiffs have *increased* their ERS bond holdings.  *See e.g.*, Fifth Suppl. Verified Stat. of ERS Secured Creditors, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico* (No. 17-03566) (filed D.P.R. July 2, 2020) (showing increase in ERS bond holdings from 2019 to 2020 of plaintiffs Pentwater Capital (and related entities) and Mason Capital of approximately $83.7 million and $72.7 million, respectively).  A78-96.

[6]    On July 14, 2020, Judge Swain entered a scheduling order to govern the various dispositive motions that have been filed in the different ERS adversary proceedings, and included placeholder deadlines for document discovery and further proceedings once the pending motions are eventually resolved.  *See* Order Modifying Discovery and Briefing Schedules, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico* (No. 17-03566) (entered D.P.R. July 14, 2020). A305-313.  That scheduling order was further amended in August 2020.

*Puerto Rico* (No. 17-03566) (filed March 25, 2020).  A97-129.  In their supplemented claims, the

ERS bondholders assert a variety of claims under PROMESA premised on the post-petition

legislation upon which they also base a portion of their takings claims here.  A99-112.

Moreover, in connection with their administrative expense claims, the ERS bondholders

allege those claims are unaffected by the First Circuit's Section 552 decision that forms part of

the basis of their takings claim here.  *See* ERS Bondholders' Brief in Opposition to Motion to

Dismiss Administrative Expense Claims, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*

(No. 17-03566) (filed Jun. 17, 2020) at 1-2.  A147-148.  The ERS Bondholders have also

asserted additional claims for compensation in the Title III proceedings—including fraud

claims—that they argue arose *because of* the First Circuit's decision.  *See* ERS Bondholders'

Supplement to Proofs of Claim at 17-18 (citing 948 F.3d at 468-70) (emphasis added).  A113-14.

ARGUMENT

I.     <u>Standards Of Review</u>

"RCFC 15(a)(2) provides that where, as here, a party can no longer amend its pleading

'as a matter of course,' it may do so 'only with the opposing party's written consent or the court's

leave.'"  *HCIC Enterprises, LLC v. United States*, No. 18-1943C, 2020 WL 4197996, at *3 (Fed.

Cl. July 9, 2020) (quoting RCFC 15(a)(2)).  "Although the Court should 'freely give leave' to a

party seeking to amend its pleading 'when justice so requires,' that principle is not unlimited."

*Id.*  "'[F]utility of amendment,' among other things, may justify denial of a motion to amend."

*Id*. (quoting *Foman v. Davis*, 371 U.S. 178, 182, (1962)).  It is within the trial court's discretion

as to whether to grant or deny leave to amend.  *See id*.

In addressing a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the

complaint, which must be well-pleaded in that it must state the necessary elements of the

plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted).  Plaintiffs "bear the burden of establishing the court's jurisdiction over [their] claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).  "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. (citing *Henke*, 60 F.3d at 797). In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), however, the Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

To avoid dismissal for failure to state a claim under RCFC 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367(Fed. Cir. 2012) (quoting *Acceptance Ins. Cos., Inc. v. United States,* 583 F.3d 849, 853 (Fed.Cir.2009).  "The facts as alleged 'must be enough to raise a right to relief above the speculative, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id*. at 1367-68 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "At the same time, a court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

II.     The Court Should Deny Plaintiffs' Motion To Amend Their Complaint A Second Time
        Because Such Amendment Would Be Futile

        The Court should deny plaintiffs' motion for leave to file a second amended complaint.

Through their motion for leave to amend, plaintiffs fail to adequately address the Supreme

Court's rejection of the foundational premise of their original complaint—that the Board is part

of the Federal Government.  Instead, plaintiffs double-down on that rejected theory and seek

leave to add two additional counts, both of which are outside this Court's jurisdiction and fail to

state a claim, as described in detail below.  When "the undisputed facts of this case do not

support . . . a takings claim . . . permitting [plaintiffs] leave to amend would be futile."  *Leider v.*

*United States*, 301 F.3d 1290, 1299 n.10 (Fed. Cir. 2002).

        Alternatively, should the Court grant plaintiffs leave to file a second amended complaint,

the Court should dismiss that complaint for the same reasons that amendment would be futile.

All three counts of the second amended complaint are outside this Court's jurisdiction and fail to

state a claim, as detailed below.

III.    The Court Does Not Possess  Jurisdiction Over Plaintiffs' Takings
        Claim Regarding Legislation Enacted By The Government Of Puerto Rico

        A.      The Court Does Not Possess Jurisdiction To
                Entertain Plaintiffs' Claim Because The
                Board Is Part Of The Government Of Puerto Rico

        This Court's jurisdiction is limited.  *Golden v. United States*, 955 F.3d 981, 986 (Fed. Cir.

2020).  The Court's authority to grant relief against the United States is defined by the extent to

which the United States has waived sovereign immunity.  *United States v. Testan*, 424 U.S. 392,

399 (1976).  "[T]he United States, as sovereign, 'is immune from suit save as it consents to be

sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to

entertain the suit.'"  *Id.* at 399 (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

16

"[I]n a Court of Claims context . . . waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* at 399 (citations omitted).

Pursuant to the Tucker Act, this Court possesses jurisdiction, in relevant part, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). This Court's "jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States . . . and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court." *Sherwood*, 312 U.S. at 588.

Plaintiffs' first count is not directed at the Federal Government, instead targeting the actions of the Board, which is not part of the Federal Government, and therefore this count must be dismissed.[7] The Board is "an entity within the territorial government" of Puerto Rico and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(b)-(c). Congress's express designation that the Board is a territorial entity disposes of this case. The Federal Circuit and its predecessor, the Court of Claims, have recognized the dispositive nature of such a congressional designation for purposes of determining whether Tucker Act jurisdiction exists. *See Slattery v. United States*, 635 F.3d 1298, 1307 n. 3 (Fed. Cir. 2011) (*en banc*) ("In *Green v. United States* . . . the court held that the United States could not be sued for actions of Amtrak because Congress expressly provided that '[t]he Corporation will not be an agency or establishment of the United States Government.'") (quoting 229 Ct. Cl. 812, 814 (1982)); *Green*, 229 Ct. Cl. at 813-14 ("[I]f Congress explicitly severed all governmental nexus with an instrumentality it created, then there would be no

---

[7] Count One is labeled "First Claim for Relief."

[Tucker Act] jurisdiction in this court over actions brought against that instrumentality.") (citing *Butz Engineering Corp. v. United States*, 204 Ct. Cl. 561, 499 F.2d 619 (1974), *abrogated on other grounds by Slattery*, 635 F.3d at 1321)); *see also Brown v. United States*, No. 19-671C, 2019 WL 5681549, at *5 (Fed. Cl. Nov. 1, 2019) (citing *Slattery* and *Green* as binding precedent on this issue).[8]

Moreover, as the Supreme Court held this year, "Congress did not simply state that the Board is part of the *local Puerto Rican government*. Rather, Congress also gave the Board a structure, a set of duties, and related powers all of which are consistent with this statement." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1661 (2020) (emphasis added). Yet, despite the *Aurelius* Court's unanimous ruling that the Board is a territorial entity of Puerto Rico for *both* statutory *and* constitutional purposes, plaintiffs continue to claim that the Board is part of the United States Government, under the test set forth in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995).[9] *See* Complaint, ¶ 68 ("Under the test set forth in *Lebron*, the [] Board is a part of the federal government for Taking Clause purposes."). Plaintiffs' arguments are contrary to the Supreme Court's holding in *Aurelius* and are therefore meritless.

In an attempt to distinguish *Aurelius*, plaintiffs distort the Supreme Court's holding by inserting the word "federal" in brackets. They state that "all parties to *Aurelius* 'agree[d] that

---

[8] Judge Braden's partial ruling on our previous motion to dismiss did not address either *Slattery* or *Green*. *See generally Altair Glob. Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742 (2018).

[9] In *Lebron*, the Court recognized that a statutory provision providing that Amtrak was not a Federal entity is "assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control." 513 U.S. at 392. The Tucker Act jurisdiction of this Court is entirely within Congress's control.

[*sic*] Board is a [federal] Government entity."  Compl., ¶ 69 (quoting *Aurelius*, 140 S.Ct. at

1663-64) (alterations in Complaint).  As such, plaintiffs contend, *Aurelius* distinguished *Lebron*

because *Aurelius* was an Appointments Clause case, and plaintiffs contend that the Takings

Clause and the Appointments Clause have different tests for determining the local versus Federal

status of an entity.  *See id*.  This is simply untrue.  Not only did the Supreme Court never state

that all parties agreed the Board was *Federal* (which would be contrary to the Court's holding), a

central argument in the Government's briefing to the Court was that under the proper test set

forth in *Palmore v. United States*, 411 U.S. 389 (1973), the Board is clearly a territorial entity.

*See* Brief of the United States, *Financial Oversight and Management Board for Puerto Rico v.*

*Aurelius Investment, LLC,* 2019 WL 3408807 (U.S.), 50-53.   The Court agreed that *Palmore*

provided the appropriate test.  *See Aurelius*, 140 S.Ct. at 1664.

     Further, the Court explained in *Aurelius* (as we have argued in this Court) that *Lebron* did

not apply in determining whether the Board was Federal or territorial, because *Lebron*

considered for First Amendment purposes whether Amtrak "was governmental *or private*."

*Aurelius*, 140 S. Ct. at 1663 (emphasis added).  In *Aurelius*, as the Court recognized, there was

no dispute that the Board was governmental, *as opposed to private*, making *Lebron* inapt.  *Id*. at

1663-64 ("All here agree that the Board is a Government entity, *but that fact does not answer the*

*"primarily local versus primarily federal" question*.") (emphasis added).  Accordingly, the

question the *Aurelius* Court was deciding concerned which type of Government agency—Federal

or territorial—the Board is, and it held that the Board is not a Federal entity.

     In the partial ruling on our prior motion to dismiss, Judge Braden's conclusion that the

Board is a Federal entity only illustrated the undisputed fact that the Board is not a private entity,

resting, as it did, on applying factors derived from *Lebron*.  *See Altair*, 138 Fed. Cl. at 760-63.  In

light of the *Aurelius* Court's holding that *Lebron* does not supply the relevant test for differentiating between local and Federal entities, Judge Braden's ruling to the contrary cannot stand.  Moreover, in *Aurelius* the Court held that "Congress gave the Board a structure, a set of duties, and related powers all of which are consistent" with the Board being "part of the local Puerto Rican Government."  140 S. Ct. at 1661.  These factors included that the Government of Puerto Rico pays the Board's expenses, and the Board issues subpoenas pursuant to Puerto Rico law and enforceable only in Puerto Rico's courts.  *Id.*  The *Aurelius* Court also based its holding on the fact that the Board's fiscal and budgetary powers all relate to the Commonwealth and are "quintessentially local."  *Id.* at 1662.  Furthermore, the Court observed, that while the Board can initiate bankruptcy proceedings, "in doing so, it acts not on behalf of the United States, but on behalf of, and in the interests, of Puerto Rico."  *Id.*

Because the Board is indisputably part of the Commonwealth government—both statutorily and constitutionally—the plaintiffs' claims in Count One, which are based on the actions of the Board and not the Federal Government, are outside the jurisdiction of this Court and must be dismissed.  *See Sherwood*, 312 U.S. at 588.

B.    Plaintiffs' Alternative Theory Of Derivative Liability Is Meritless

In the alternative, plaintiffs assert that even if the Court were to follow Supreme Court precedent and conclude that the Oversight Board is part of the Commonwealth Government, "the Oversight Board's actions would remain those of the federal government for Taking[s] Clause purposes," thereby allowing them to bring suit in this Court.  *See* Compl., ¶ 70.  Plaintiffs are mistaken.  For "it has been uniformly held" with respect to this Court that "if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court."  *Sherwood*, 312 U.S. at 588; *see also Shelden v. United States,* 742 Fed. Appx. 496, 500 (Fed. Cir. 2018) ("the Claims Court does not possess jurisdiction over

claims brought against persons, entities, and ***territories*** other than the United States.") (emphasis added).

Although the complaint may be nominally against the United States, "that distinction is merely formalistic," as it is "well settled" that courts "look 'to the true nature of the action in determining the existence or not of jurisdiction.'" *St. Bernard Par. Gov't v. United States*, 916 F.3d 987, 996 (Fed. Cir. 2019) (quoting *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir. 2005)). By their own admission, plaintiffs' alternative theory seeks relief from the United States for the actions of Puerto Rico's government. This unsupported notion, if accepted, would open the floodgates to litigation in this Court over disputes arising from territorial governments' actions.

In support of their position, plaintiffs claim that "U.S. territories, including Puerto Rico, 'are not sovereigns distinct from the United States.'" Compl. ¶ 70 (quoting *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1873 (2016)). Plaintiffs again distort the holding of a Supreme Court case. The "not sovereigns distinct from the United States" language comes from a discussion in *Sanchez Valle* regarding the historical status of Puerto Rico in the early 20th Century. *Sanchez Valle*, 136 S. Ct. at 1873 (citing *Grafton v. United States*, 206 U.S. 333, 355 (1907)). *Sanchez Valle* was not a Takings or even an Appointments Clause case; rather it was a double jeopardy case and "'sovereignty' in [that] context does not bear its ordinary meaning." *Id*. at 1870. Instead, the test the Court has "devised to decide whether two governments are distinct for double jeopardy purposes overtly disregards common indicia of sovereignty." *Id*.

The *Sanchez Valle* Court recognized that for most purposes Puerto Rico is akin to a State." *Id*. at 1874 ("Congress in 1952 'relinquished its control over [the Commonwealth's] local affairs[,] grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by

the States.'") (quoting *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 597 (1976)).  Congress's intent in enacting such legislation "was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union."  *Id.* (quoting *Flores de Otero*, 426 at 594).  Indeed, the *Sanchez Valle* Court held that if "double jeopardy decisions hinged on measuring an entity's self-governance," rather than a historical inquiry into the origins of an entity's prosecutorial power, the Court would have concluded that Puerto Rico was a separate sovereign.  136 S. Ct. at 1874.

Moreover, Plaintiffs' theory is inconsistent with the way courts have historically treated takings effected by territorial officials: as takings undertaken by a territorial government and not the Federal government, with the appropriate remedy being either an inverse-condemnation action under territorial law or a Section 1983 action under Federal law.  *See, e.g.*, *People of Puerto Rico v. Eastern Sugar Assocs.*, 156 F.2d 316 (1st Cir. 1946); *Deniz v. Municipality of Guaynabo*, 285 F.3d 142 (1st Cir. 2002); *Fideicomiso de la Tierra del Cano Martin Pena v. Fortuno*, 604 F.3d 7 (1st Cir. 2010); *Gov't of Guam v. Moylan*, 407 F.2d 567 (9th Cir. 1969); *see generally* 42 U.S.C. § 1983 (creating a cause of action for constitutional violations, including Takings Clause violations, "under color of any statute . . . of any State or Territory or the District of Columbia.").  Indeed, plaintiffs recognized as much when they filed, in the Title III proceedings, a takings complaint directly against the Commonwealth.  *See e.g.*, Amended ERS Bondholder Adversary Complaint, ¶ 138 (A67) ("The Takings Clause applies to the States, *and the Commonwealth*, by virtue of Section 1 of the Fourteenth Amendment.") (emphasis added).  Because the United States cannot be held derivatively liable for the actions of the Government of Puerto Rico, Count I of the Complaint must be dismissed as outside this Court's jurisdiction.

IV.    The Court Lacks Jurisdiction To Entertain
       Plaintiffs' Takings Claims Because Congress Has Placed
       Jurisdiction For Claims Arising Under PROMESA In The District Court

Plaintiffs' claims should additionally be dismissed because, pursuant to PROMESA, their

claims belong in district court.  In their motion to amend, plaintiffs admit that they are bringing

this action pursuant to PROMESA, which vests jurisdiction in the United States District Court of

Puerto Rico, not this court.  Mot. to Amend at 2 ( "[T]his is an action for just compensation from

the United States of America for the taking of Plaintiffs' constitutionally protected property in

connection with the restructuring of the Commonwealth of Puerto Rico's debts, and those of its

instrumentalities, *pursuant to the Puerto Rico Oversight, Management, and Economic Stability*

*Act ("PROMESA")* . . . ."). (emphasis added); *see also id*. at 3 (contending that the First

Circuit's Section 552 decision "gives rise to an additional taking *based on PROMESA's*

retroactive application of § 552 to destroy Plaintiffs' existing liens.") (emphasis added).

Congress has expressly provided that jurisdiction lies in the Federal district court in

Puerto Rico for all claims arising out of PROMESA, whether in whole or in part:

> Except as provided in section 2124(f)(2) of this title (relating to the
> issuance of an order enforcing a subpoena), and subchapter III
> (relating to adjustments of debts), any action against the [] Board,
> and any action otherwise arising out of this chapter, in whole or in
> part, *shall be brought* in a United States district court for the
> covered territory . . .

48 U.S.C. § 2126(a) (emphasis added). Plaintiffs' suit arises out of PROMESA, if not "in whole"

then certainly at least "in part," because two counts of their complaint are takings claims based

on Congress's very enactment of PROMESA, while the other is based on the actions the Board

took pursuant to PROMESA.  The jurisdictional language in Section 2126(a) manifests

Congress's intent that all suits relating to PROMESA be heard in district court.  *See Conoco, Inc.*

*v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994) (holding that use of

"arising out of" language in jurisdictional statute reflected congressional intent to give the Court of International Trade "broad exclusive jurisdiction" over matters arising under trade statutes).

Thus, PROMESA required plaintiffs to bring this action in the District Court for Puerto Rico.

That plaintiffs have raised a constitutional claim does not change this analysis. Here, plaintiffs' two new takings counts (Counts Two and Three) arise from claims that they asserted under PROMESA in the Title III proceedings, which were denied, and for which they now seek compensation. This situation is analogous to the plaintiffs in *Weinberger v. Salfi* who brought claims under the Social Security Act, but argued that their claims arose only under the Constitution. *See* 422 U.S. 749, 760 (1975). The Supreme Court rejected plaintiffs' argument that their constitutional challenge only "arose under" the Constitution and not the Social Security Act, where they sought to recover Social Security benefits and the statute provided "both the standing and the substantive basis for the presentation of their constitutional contentions." *Id*. at 760-62 (holding that the jurisdictional statute "do[es] not preclude constitutional challenges. [It] simply require[s] that they be brought under jurisdictional grants contained in the Act, and thus in conformity with the same standards which are applicable to nonconstitutional claims arising under the Act."); *accord Wilson ex rel. Estate of Wilson v. United States*, 405 F.3d 1002, 1011-12 (Fed. Cir. 2005) (affirming Court of Federal Claim's dismissal because constitutional claim arose under the Medicare Act).

Moreover, the Supreme Court has recognized that Congress can, by statute, remove this Court's ability to entertain particular Fifth Amendment takings claims. *See Horne v. Dep't of Agric.*, 569 U.S. 513, 526-27 (2013) (collecting cases); *see also Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1097 (Fed. Cir. 2018) (relying on *Horne* to conclude takings claim precluded under the Tucker Act by statutory scheme). We recognize that, in Judge Braden's

partial ruling on our motion to dismiss plaintiffs' first amended complaint, the court determined

that PROMESA does not displace Tucker Act jurisdiction, with respect to what is now Count

One of plaintiff's complaint. *See Altair*, 138 Fed. Cl. at 754-60. However, we respectfully

suggest that Judge Braden's ruling was incorrect and should be revisited. *Rick's Mushroom*

*Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge,

or the court may raise *sua sponte*, subject matter jurisdiction at any time.").

Judge Braden acknowledged that "Section 2126(a) of PROMESA reflects Congress'

intent that the United States District Court of Puerto Rico is the proper venue with jurisdiction to

adjudicate . . . 'any action otherwise arising out of [PROMESA], in whole or in part," and that

the plain meaning of the statute must be enforced. *Altair*, 138 Fed. Cl. at 755 (citations omitted).

However, the court's ruling ignored the plain language of the statute and held that jurisdiction

lies in this Court because the statute does not specifically mention the Tucker Act. *See id*.

However, if a statute is specific enough in making another forum exclusive, it does not need to

mention the Tucker Act by name. *See Hinck v. United States*, 550 U.S. 501, 508 (2007) (holding

statute providing Tax Court jurisdiction over interest abatement suits foreclosed jurisdiction in

the Court of Federal Claims). Adhering to Congress' express command is particularly important

in a suit against the United States, which is immune from suit unless it consents and where the

terms of it consent define a court's jurisdiction to entertain a suit. *See Testan*, 424 U.S. at 399.

V.    Plaintiffs' Takings Claims Are Not Ripe For Adjudication

Even if the Court possessed jurisdiction to entertain plaintiffs' takings claims, their

claims would not be ripe for adjudication. "Ripeness is a justiciability doctrine that 'prevent[s]

the courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements." *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir.

2015) (citations omitted). "Determining whether a dispute is ripe for review requires evaluation of: (1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'" *Id.* (citations omitted). "A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383 (Fed. Cir. 2012).

Plaintiffs' claims here are not ripe for several independent reasons, each of which is sufficient to warrant dismissal of the complaint. First, plaintiffs base their two new takings counts upon the First Circuit's *Section 552 Decision*. *See* Complaint at ¶¶ 116-128. However, the ERS bondholders—including most of the plaintiffs—have petitioned the Supreme Court for *certiorari* to review the First Circuit's decision. In their petition, the ERS bondholders contend that Congress intended to *protect* their interests in enacting Section 552, and that the First Circuit's ruling misinterpreted the statute and is at odds with precedent from several other Circuits. *See e.g.*, *Section 552* Cert. Pet., 2020 WL 4569211 (U.S.) at 20-25. Highlighting the lack of ripeness in their complaint, plaintiffs twice state with respect to their allegations concerning the *Section 552 Decision*, that "ERS Bondholders establish these allegations *in case* the Supreme Court denies review or affirms the First Circuit's decision." Compl. ¶ 86 n.18; ¶ 89 n.19 (emphasis added).

In *Shinnecock*, the Federal Circuit upheld the dismissal of an Indian tribe's claim for compensation from the Federal Government arising from the alleged taking of the tribe's property by the State of New York. *See Shinnecock Indian Nation*, 782 F.3d at 1353. The Court held that the tribe's claim was not ripe, because whether the tribe had actually been deprived of its property rested upon a district court decision that was on appeal to the Second Circuit. *Id.* at 1348-49. "Until the Second Circuit—and possibly the Supreme Court—have had an opportunity

to review, and possibly reverse or revise, the district court's judgment, it would be premature to determine whether the United States breached any trust obligation to provide the Nation with effective redress for the loss of its lands." *Id.* at 1349.

The same holds true here. Until the Supreme Court has an opportunity to review the bondholders' petition, and possibly reverse the First Circuit's *Section 552 Decision*, it would be premature to determine whether the United States committed a taking through the enactment of PROMESA. As in *Shinnecock*, "the present case . . . involves the unusual situation in which the claims asserted against the United States rest upon the outcome of litigation still pending in another forum," and therefore must be dismissed. *Id.* at 1350-51.

Moreover, notwithstanding the *Section 552 Decision* and their petition for *certiorari*, the ERS Bondholders are also pressing ahead with their claims in the Title III proceedings. The ERS Bondholders are currently litigating with ERS and the Commonwealth regarding their proofs of claims and administrative expense motions, and the parties have filed competing motions for judgment on the pleadings, covering a myriad of claims by the bondholders. In addition, there are at least six ongoing adversary proceedings involving the ERS bondholders that relate to the scope of the bondholders' liens and the question of whether the bonds were issued *ultra vires*. There will be no determination of whether, and to what extent, plaintiffs will be paid for their bonds until the District Court resolves these issues and enters a final plan of adjustment in the ERS Title III proceedings.[10]

Indeed, the ERS Bondholders have contended in the Title III proceedings, "the 552 Decision does not justify the dismissal *of any*—much less all—of [their] claims." *See* ERS

---

[10] The possibility of a multitude of interwoven issues and claims arising in Title III cases might explain why Congress also placed jurisdiction for all other claims arising under PROMESA in the district court for the territory as well.

Bondholders' Brief in Opposition to Motion to Dismiss Administrative Expense Claims at 1-2 (emphasis added)  A147-48.  In the Title III proceedings, the ERS Bondholders argue that their full recovery under the bonds is not limited by the collateral available, because the bonds "expressly are payable from Pledged Property *regardless of whether a valid and enforceable lien exists*."  *See* ERS Bondholders' Reply in Support of Motion for Judgment on the Pleadings, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico* (No. 17-03566) (filed August 6, 2020) at 1 (emphasis added).  A272.

The ERS bondholders are also continuing to litigate their claims concerning the post-petition legislation, which are the basis for Count One of their proposed second amended complaint here, in the Title III proceedings.  *See* Compl., ¶¶ 104-115.  In those proceedings, the ERS bondholders contend that their post-petition legislation claims "were not eliminated by the 552 Decision, because Claimants' collateral extends beyond the post-petition employer contributions affected by the Decision and because the Post-Petition Legislation interfered with Claimants' contractual rights and their ability to recover on their unsecured claims against ERS." *See* Reply in Support of Motion for Judgment on the Pleadings at 12.  A158.  Furthermore, the ERS Bondholders have asserted claims in the Title III proceedings that they argue actually arose *because of* the First Circuit's decision—in other words, they claim that decision has *increased* their ability to seek compensation in the Title III case.  *See* ERS Bondholders' Supplement to Proofs of Claim at 17-18 (citing 948 F.3d at 468-70) (emphasis added).  A113-14.

Beyond the issues directly tied to the *Section 552 Decision*, the parties in the Title III proceedings are also litigating other matters related to the ERS bonds that would need to be resolved before plaintiffs' complaint could possibly ripen.  For example, the Special Claims Committee and the Creditors' Committee commenced adversary proceedings seeking to recover

monies paid to ERS Bondholders on the ground that the issuance of the ERS Bonds was *ultra vires*, and therefore any payments thereon were constructive fraudulent conveyances. *See* Adv. Proc. Nos. 19-356, 19-357, 19-358, 19-359, and 19-361 (LTS) (filed D.P.R. May 29, 2019). The parties are also litigating whether the ERS bondholders possess valid and enforceable security interests in any of ERS's remaining assets or the proceeds generated by those assets. *See* Adv. Proc. Nos. 19-366 and 19-367 (LTS) (filed D.P.R. May 20, 2019). Discovery was ongoing in those proceedings at the time plaintiffs filed their second amended complaint here, and the Title III court's current scheduling order contemplates that briefing in these adversary proceedings will continue into November 2020.

Ultimately, it will not be until the court enters a final plan of adjustment in the ERS Title III proceedings that the ERS bondholders will know how much compensation they will receive for their interests in the bonds. *See* 48 U.S.C. § 2174 (setting forth criteria for approval of plan of debt adjustment under PROMESA). The outcome of that inquiry will directly affect the amount of any compensation that plaintiffs would be entitled to recover here, if it is ultimately determined that a taking occurred. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1943-44 (2017) (reiterating that the test for regulatory takings requires a court to "compare the value that has been taken from the property with the value that remains in the property") (quoting *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 497 (1987)). Indeed, until it has been determined whether and to what extent plaintiffs' property interests have actually been impaired, it is impossible to say whether a regulatory taking has occurred *at all*. That is the definition of an unripe claim, and thus plaintiffs' claims here must be dismissed.

VI.    Plaintiffs Fail To State A Claim Because The Application
       Of Section 552 To Plaintiffs' Claims Did Not Result In A Taking

   A.    The First Circuit Held That The ERS Bondholders Possessed No
         Property Interest In The Employer Contributions Affected By Section 552

"It is axiomatic that only persons with a valid property interest at the time of the taking

are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)

(citing *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473-74,

(1973)) (additional citations omitted); *see also Rogers v. United States*, 814 F.3d 1299, 1303

(Fed. Cir. 2015) (valid property interest is a prerequisite to a takings claim).  "Because the

Constitution protects rather than creates property interests, the existence of a property interest is

determined by reference to 'existing rules or understandings that stem from an independent

source such as state law.'" *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998)

(quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)); *see also Am.

Bankers Ass'n v. United States*, 932 F.3d 1375, 1385 (Fed. Cir. 2019) ("Property interests arise

from 'existing rules and understandings and background principles derived from an independent

source, such as state, federal, or common law . . . .'" (quoting *Air Pegasus of D.C., Inc. v. United

States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (internal quotation marks omitted)).

Central to the First Circuit's *Section 552* decision was the question of whether the ERS

bondholders had a property interest in the employer pension contributions upon which they

claimed to have liens.  As the First Circuit described it, the ERS Bondholders entire appeal

hinged on their argument that ERS's "statutory authority to receive Employers' Contributions

constituted a property right."  *Section 552 Decision*, 948 F.3d at 466.  From that premise flowed

the ERS Bondholders' argument that they possessed "a security interest in [ERS's] property right to receive those Contributions." *Id.*

However, the First Circuit held that ERS's "statutory authority to receive postpetition Employers' Contributions constituted merely an expectancy *and not a property 'right'* as it is clear that the payment and the amounts of the Contributions depended on work occurring on and after the petition date." *Id.* at 468 (emphasis added). The Court opined that its decision was reinforced by the language of the Bond Resolution and the Official Statement for the bonds, which "explicitly contemplated that the payment of Future Contributions was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures." *Id.* Indeed, as the Court noted, the Bond Resolution explicitly states that the legislature of the Commonwealth might take action that affects the amount of employer contributions. *Id.* at 468-69; *see also* Compl., Exhibit A at VI-16 (noting that legislative changes may "may adversely affect the ability of [ERS] to comply with its obligations."); *accord Am. Bankers Ass'n*, 932 F.3d at 1385 ("'unilateral expectation' that [legislature] would not exercise its right to amend the dividend provision going forward does not give rise to a compensable property interest under the Fifth Amendment." (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)).

Because employer contributions to ERS based on work performed after the Title III petition was filed could not be determined at the time the petition was filed, those contributions were not due prepetition "*and the Bondholders did not have any security interest in such contributions*." *Section 552 Decision*, 948 F.3d at 468 (emphasis added). Thus, the First Circuit held, the ERS Bondholders "*did not have a prepetition property right* in any postpetition contributions that might be made. At most, the Bondholders had an expectation." *Id.* (emphasis

added).  The Court noted, "typically, local law creates and defines property interests in

bankruptcy proceedings." *Id*. at 468, n. 8. (citing *Soto-Rios v. Banco Popular de P.R.*, 662 F3d

112, 117 (1ˢᵗ Cir. 2011)). "Puerto Rico law recognizes that the mere expectancy of property is

not itself a property interest." *Id*. (*citing Redondo-Borges v. HUD*, 421 F.3d 1, 9 (1ˢᵗ Cir. 2005);

*Carrasquillo v. Aponte Roque*, 682 F. Supp. 137, 141 (D.P.R. 1988)).[11]  Indeed, the Court

observed, "this treatment of expectancies as not property interests is generally accepted."  *Id*.

(citing Restatement (Third) of Trusts § 41 cmt. A (Am Law. Inst. 2003)).  The Court also

rejected the ERS Bondholders argument that they had a lien on employers' obligation to pay

down ERS's deficits, because no such obligation exists.  *Id*. at 470-71 ("It is impossible to have a

lien on something that does not exist.") (citing *Sims v. Jamison*, 67 F.2d 409, 411 (9ᵗʰ Cir.

1933)).

        Indeed, the ERS bondholders have acknowledged the First Circuit's holding that they

possess no property interest in the employer contributions upon which they claimed to have

liens.  In fact, they have filed several claims against ERS based upon that ruling.  For instance, in

their administrative expense motion, the ERS bondholders allege that in "the Section 552

---

[11]  The First Circuit also rejected the ERS Bondholder's alternative argument that Puerto
Rico's adoption of the revised Uniform Commercial Code (UCC) altered Puerto Rico law's
distinction between expectancies and property, making the Employer Contributions secured
proceeds.  *Section 552 Decision*, 948 F.3d at 472.  Without deciding whether the bondholders
had accurately characterized the revised UCC, the Court held that even if the law had changed,
the ERS Bondholders still would not have the security interest that they claim.  *See id*. The
Employer Contributions would not have become collateral to which a lien could attach until after
the work was performed, which was not until after the PROMESA petition was filed.  *See id*.
Obviously, in that scenario, the collateral also would not have come into existence until after the
enactment of PROMESA, and its incorporation of Section 552.  *See First Nat'l Bank of Colo.
Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868, 870-71 (Bankr. D. Colo. 1982) (holding
Section 552 did not affect an unconstitutional taking because "before the Bank's interest became
a property right, that interest was altered by [§]552 of the Bankruptcy Code.").

Decision, however, the First Circuit determined that, as set forth in the Section 552 Decision, ERS's interest in the right to receive employers' contributions *did not amount to property, and thus ERS did not have power to grant liens on this interest*. . . . If the Section 552 decision is upheld, ERS's representations will have been false, and ERS will have breached its covenant regarding its power to grant liens on the Pledged Property." *See* ERS Bondholders' Supplement to Proofs of Claim, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico* (No. 17-03566) (filed March 25, 2020) at 17-18 (citing *Section 552 Decision*, 948 F.3d at 468-70) (emphasis added). A113-114.  Thus, according to the ERS bondholders themselves, the First Circuit did not hold that Section 552 destroyed their existing property interests, but rather that ERS lacked the ability to convey a property interest in yet-to-be-earned contributions. *See id*. at 17-22.  A113-18.  If a property right had previously existed, and it was only by operation of Section 552 that the right was destroyed, presumably the ERS Bondholders would not have levied allegations in the Title III proceedings that ERS falsely represented that it had a property interest. *See id*. at 17-18. A113-14. [12]

B.    The First Circuit's Holding Regarding Plaintiffs' Lack Of
A Property Interest Is Collateral Estoppel In These Proceedings

Collateral estoppel bars a party from relitigating an issue that it has already had a full and fair opportunity to litigate. *See Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001). Collateral estoppel has four required elements: "(1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was

---

[12]  At the very least, plaintiffs' legal arguments in the Title III proceedings that ERS falsely represented that it had the right to grant liens on postpetition employer contributions are irreconcilable with the legal averments in their complaint here that ERS did have the power to grant such liens and Section 552 destroyed them. *See e.g.* Compl. ¶¶ 87-90.  In event, the Court is not bound to accept legal conclusions in the complaint. *Iqbal*, 556 U.S. at 678.

necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Id*. The First Circuit's ruling in the *Section 552 Decision* that the ERS Bondholders never possessed a property interest in future employer contributions to ERS satisfies all four criteria.

First, the issues are identical. In their proposed second amended complaint, plaintiffs allege that they "possessed a constitutionally protected property interest in the form of valid and enforceable liens on employer contributions as they become owed." Compl. ¶ 118. Yet, this is precisely the issue that the First Circuit decided against the ERS Bondholders.[13] As previously discussed, the First Circuit held that "the Bondholders did not have any security interest in such contributions," and therefore "did not have a prepetition property right in any postpetition contributions that might be made." *Section 552 Decision*, 948 F.3d at 468.

The First Circuit ruling also easily meets the remaining three factors for collateral estoppel. Not only *were* the issues actually litigated, before the Title III Court and the First Circuit (which included the filing of a petition for rehearing *en banc* on this very issue), they are continuing to be litigated at the Supreme Court where a petition for *certiorari* has been filed. The determination of the issue was necessary to the First Circuit's judgment, as the First Circuit held that the ERS Bondholders' purported interests did not fall within the protections of Section 552 *because* they were not property rights. *See Section 552 Decision*, 948 F.3d at 468-70. Finally, the parties defending against preclusion (plaintiffs) had a full and fair opportunity to

---

[13]  Plaintiffs Nokota and Altair were parties at the time the Title III Court ruled against the ERS bondholders on the Section 552 issue, but chose not to participate in the First Circuit appeal that affirmed that decision.

litigate these issues, which was the subject of extensive briefing and argument before both the Title III court and the First Circuit, and are now before the Supreme Court.

The Federal Circuit's decision in *Banner* is on all fours with this case.  In *Banner*, the Federal Circuit affirmed this Court's ruling that plaintiffs were bound by prior decisions from the Second Circuit and the district court, which held that plaintiffs did not possess a property interest in the leases they claimed were taken by Congress's enactment of a statute.  *See Banner*, 238 F.3d at 1355-56.  Because plaintiffs had the opportunity to fully litigate this issue before the Second Circuit and the district court, collateral estoppel precluded them from relitigating the existence of a property right before the Court of Federal Claims. *See id*.  Applying collateral estoppel required the dismissal of the action for failure to state a claim, because "without a property interest, there can be no taking within the meaning of the Fifth Amendment."  *Id*. at 1356.

Because the First Circuit has already held that plaintiffs do not possess a property interest in the future employee contributions they claim were affected by the enactment of Section 552, Counts Two and Three of the Complaint must be dismissed.[14]

C.    Plaintiffs' Purported Property Interests Are
       Not The Type Protected By The Takings Clause

Even putting aside First Circuit's holding that plaintiffs' lacked a property interest in liens on future, contingent employer contributions, the type of property interest that plaintiffs assert is not the type traditionally protected by takings law.  In past briefing, plaintiffs have attempted to rely upon several Supreme Court cases to claim a protected property interest.  *See*

---

[14]  As previously discussed, Count One of the Complaint—which is based upon actions taken by the Board—must be dismissed in accordance with the Supreme Court's decision in *Aurelius*.  However, were Count One not to be dismissed on that basis, collateral estoppel would bar that portion of Count One that relates to post-petition employment contributions.

Opp. to Mot. to Dismiss First Amend. Compl., ECF No. 21 at 33, 35 ( citing *United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982), *Armstrong v. United States*, 364 U.S. 40 (1960), and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935)).  However, none of those cases involved liens on after-acquired property.  Instead, they all involved protection of "traditional property interests," *Sec. Indus.*, 459 U.S. at 75, such as liens on household furnishings, *id.* at 72, boats, *Armstrong*, 364 U.S. at 41, and real property, *Radford*, 295 U.S. at 587.[15]

Indeed, Section 552 codified long-standing common law.  *See Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) (holding that there cannot be "creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt."); *see also In re Hamilton*, 18 B.R. at 870 ("It is impossible on the face to have a vested property right in after-acquired property. That is so because, by definition, after-acquired property is a mere contingency.")

Moreover, it is far from clear that the enactment by Congress of a bankruptcy regime such as PROMESA could ever result in a compensable taking.  It is even less clear when that enactment stems from Congress's exercise of its plenary power under the Territories Clause to protect the economic well-being of a territory, as was the case here.  It is further improbable that Congress intended to permit debt holders to seek dollar-for-dollar compensation against the United States in the Court of Federal Claims based on PROMESA.  *See E. Enterprises v. Apfel*,

---

[15]  Moreover, the plaintiffs in *Radford* and *Security Industrial Bank* sought declaratory relief that the laws in question were unconstitutional—not just compensation.  In *Armstrong*, the Court found a compensable taking when the United States both took title to the property that was subject to the plaintiffs' liens *and*, because of sovereign immunity, plaintiffs could no longer enforce the liens against the property possessed by the Government. *See* 364 U.S. at 46-48. Here, the United States has not taken title to plaintiffs' property, and plaintiffs are still seeking to enforce their bonds in the Title III proceedings, notwithstanding Section 552.

524 U.S. 498, 517-19 (1998) (plurality opinion) ("Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation.'") (quoting *In re Chateaugay Corp.*, 53 F.3d 478, 493 (2d Cir. 1995)).  It is particularly improbable considering that PROMESA provides: the full faith and credit of the United States is not pledged for the payment of Puerto Rico's debt; any claim that the United States is liable for under PROMESA is "subject to appropriations;" and, that Federal funds are not authorized for the payment of Puerto Rico's debts.  48 U.S.C. § 2150.

      D.      **Even If Plaintiffs Possessed A Property Interest, Their Takings Claims Based On Section 552 Fail To Meet The *Penn Central* Requirements**

Even if the Court were to assume for purposes of this motion that plaintiffs actually possessed a property interest at the time PROMESA was passed, they would still fail to state a claim for a regulatory taking under the Supreme Court's framework set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  The Supreme Court established three factors for a regulatory taking in *Penn Central*: "the extent to which the regulation has interfered with distinct investment-backed expectations"; "the character of the government action"; and "[t]he economic impact of the regulation on the claimant."  *See Taylor v. United States*, 959 F.3d 1081, 1087 (Fed. Cir. 2020) (quoting *Penn Central*, 438 U.S. at 124).  Plaintiffs' takings claims based on Section 552 fail to establish a taking under each factor.

      1.      **PROMESA Has Not Interfered With Plaintiffs' Reasonable Investment-Backed Expectations**

"It is axiomatic that 'a reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'"  *Norman v. United States*, 429 F.3d 1081, 1092 (Fed. Cir. 2005) (quoting *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1005–06 (1984)).  One key aspect

of evaluating whether a plaintiff had reasonable investment-backed expectations that were
harmed by the Government's actions, is whether in the relevant regulatory environment it would
be expected that the law might change. *See Cienega Gardens v. United States*, 503 F.3d 1266,
1288 (Fed. Cir. 2007) (citing *Commonwealth Edison Co. v. United States*, 271 F.3d 1327
(Fed.Cir.2001) (*en banc*)). Those operating in regulated fields cannot assert a taking when
Congress amends the law to address gaps in the legislative scheme. *See Connolly v. Pension
Ben. Guar. Corp.*, 475 U.S. 211, 226–27 (1986) (no taking when Congress enacted pension law
imposing withdrawal liability on employers as amendment to ERISA requirements).
"Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise
settled expectations . . . even though the effect of the legislation is to impose a new duty or
liability based on past acts." *See Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers
Pension Tr. for S. California*, 508 U.S. 602, 646 (1993) (holding that plaintiff lacked a
reasonable investment-backed expectation that ERISA's original limitations would not be
adjusted) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976)).

Here, plaintiffs voluntarily entered into a confluence of highly regulated areas. They
purchased municipal bonds subject to a bond resolution that stated that ERS was issuing the
bonds due to "an unfunded liability of approximately $9.9 billion." Compl., Ex. A. at VI-1.
Those bonds, and the letter from Bond Counsel accompanying them, noted that the bonds'
enforceability "may be limited by bankruptcy, moratorium, insolvency or other laws affecting
creditors' rights or remedies theretofore *or thereafter enacted*." *Id*. at VI-3 (emphasis added).

Thus, plaintiffs were on notice that the enforceability of their bonds was potentially
subject to future bankruptcy laws. It was also apparent that Congress would be the one enacting
any such laws. Since 1946, Congress has expressly preempted state municipal bankruptcy

laws—including those enacted by Puerto Rico. *Franklin California Tax-Free Tr.*, 136 S. Ct. at 1944-45. That express preemption provision is now codified in Chapter 9. *See* 11 U.S.C. § 903(1). "It is evident from this legislative history that, because municipal bonds are widely held across the United States, Congress enacted section 903(1) to ensure that only a uniform federal law could force nonconsenting municipal bondholders to surrender or cancel part of their investments." *Franklin California Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 599 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016).

Yet, plaintiffs allege in their complaint that "since 1984, there had been no federal restructuring legislation applicable to Puerto Rico and its instrumentalities. To the contrary, by excluding Puerto Rico from its definition of who may be a debtor under Chapter 9, the modern Bankruptcy Code expressly forbade Puerto Rico and its instrumentalities from seeking relief under Chapter 9 of the Bankruptcy Code." Compl. ¶ 56. Plaintiffs argue that "in enacting PROMESA, Congress incorporated § 552 of the Bankruptcy Code into Title III, thereby making that provision applicable to the liens granted by Puerto Rico instrumentalities for the first time in over thirty years." Compl. ¶ 76. Plaintiffs' allegations reflect a fundamental misunderstanding of municipal bankruptcy law. Moreover, even if they were accurate, plaintiffs would fail to meet the reasonable investment-backed expectations test of *Penn Central*.

First, it is not accurate to suggest that since 1984 Puerto Rico has not been subject to Federal restructuring legislation. Federal bankruptcy law has defined Puerto Rico as a "State" since it was first established as a territory of the United States in 1898. *See Franklin California Tax-Free Tr.,* 136 S. Ct. at 1945. Congress recodified the bankruptcy laws in 1978, to create the Federal Bankruptcy Code, but did not include a definition of "State" in the definitional section.

*Id.* (citing Bankruptcy Reform Act, 92 Stat. 2549–2554).[16]  In 1984, Congress amended the

Bankruptcy Code to reincorporate the definition of "State."  *Id.* (citing 98 Stat. 368–369

(codified at § 101(52)).  That definition includes Puerto Rico as a "State" for *all* purposes of the

Bankruptcy Code, *including* Chapter 9, with the solitary exception that Puerto Rico is not

empowered to "specifically authorize" its municipalities to seek Chapter 9 relief.  *Id.* at 1946.[17]

The Supreme Court expressly rejected the argument that Puerto Rico is not a State under Chapter

9.  *See id.* at 1947 ("The arguments in support of that capacious reading are unavailing.").  Thus,

Congress's regulation of municipal bankruptcy law in Puerto Rico is a "background principle"

that "inhere[d]" in the municipal bonds sold by ERS in 2008, as well as any liens created by

those bonds.  *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014)

(bankruptcy law created before contract inhered in property interest).

Moreover, prior to the 1984 amendment, "Puerto Rico, like the states, could authorize its

municipalities to obtain federal municipal bankruptcy relief."  *Franklin California Tax-Free Tr.*,

805 F.3d at 329-330.  After that point, "Congress has retained for itself the authority to decide

which solution best navigates the gauntlet in Puerto Rico's case."  *Id.* at 345; *see also Puerto*

*Rico*, 136 S. Ct. at 1943 ("The [First Circuit] opined that it was up to Congress, not Puerto Rico,

to decide when the government-owned companies could seek bankruptcy relief.") (citing 805

F.3d at 345).

---

[16]  "Although the modern Code omitted a definition of the term 'State' from its enactment in 1978 until it was re-introduced in 1984, most commentators agree that this did not affect Puerto Rico's ability during that time to provide its municipalities authorization."  *Franklin California Tax-Free Tr.*, 805 F.3d at 330 (citation omitted).

[17]  Prior to the passage of PROMESA, "Puerto Rico municipalities [were] not unique in their inability to restructure their debts," as almost half the states either had not authorized or specifically prohibited their municipalities from seeking Chapter 9 relief.  *See Franklin California Tax-Free Tr.*, 85 F. Supp. 3d at 599 & n. 16.

Thus, the ERS bonds were sold in a highly regulated environment, by an entity with a $9 billion actuarial deficit, pursuant to a bond resolution that specifically contemplated the enactment of bankruptcy laws.  As such, plaintiffs can hardly claim to have had a reasonable investment-backed expectation that Puerto Rico municipalities would never be subject to the same provisions of the Bankruptcy Code that apply to municipalities throughout the United States.  "No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit."  *New York Cent. R.R. v. White,* 243 U.S. 188, 198 (1917).

Even if the Court were to accept plaintiffs' inaccurate assertion that Puerto Rico was completely excluded from municipal bankruptcy law beginning in 1984, plaintiffs would still not have a reasonable investment-backed expectation that Congress would not restore Puerto Rico to the status that it had prior to that.  Here, plaintiffs were operating in a regulatory arena over which the Constitution gives Congress the express power to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4, and specifically, as pertains to municipal bankruptcy, where Congress had preempted the field since 1946.  *See Franklin California Tax-Free Tr.*, 136 S. Ct. at 1944-45.

The Federal Circuit held in an analogous situation that plaintiffs could not have reasonably expected that Congress would refrain from changing the Federal law applicable to a particular foreign country to make it consistent with the law applied to most other countries. *Aviation & Gen. Ins. Co., Ltd. v. United States*, 882 F.3d 1088, 1098 (Fed. Cir.), *cert. denied,* 139 S. Ct. 412 (2018); *accord Belk v. United States*, 858 F.2d 706, 710 (Fed. Cir. 1988) (Executive order extinguishing former hostage's claim against Iran did not interfere with "distinct investment-backed expectations").  The Court ruled in *Aviation & General Insurance Company* that even assuming for argument's sake that plaintiffs had a reasonable investment-

41

backed expectation in the current state of the law that lifted Libya's sovereign immunity from suit; they should have foreseen that Congress could revert to the original law restoring immunity. *See* 882 F.3d at 1098 ("Surely, if Congress giveth, so too can it taketh away.").  In *Belk*, the Court ruled that plaintiffs had no reasonable-investment backed interest in their claim, even when an executive order retroactively extinguished it, where the President's actions were not "novel and unexpected."  858 F.2d at 709-10.

The "force" of the reasonable-investment backed expectation factor can be "so overwhelming," as it is here, that it is dispositive of a takings claim.  *See Ruckelshaus*, 467 U.S. at 1005.  Absent a reasonable investment-backed expectation that Puerto Rico and its instrumentalities would never again be subject to the provisions of Federal municipal bankruptcy law, plaintiffs cannot establish a regulatory taking here.  *See Commonwealth Edison Co.*, 271 F.3d at 1348-57 (ruling by *en banc* Federal Circuit affirming dismissal for failure to state a claim because examination of the existing legal regime revealed a lack of reasonable expectations by plaintiff); *accord Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1350-51 (Fed. Cir. 2004) (holding that plaintiff lacked reasonable investment-backed expectation as a matter of law where it was "easily foreseen, not necessarily as a certainty, but as a reasonable possibility" that existing law could be extended to plaintiff's property) (quoting *Commonwealth Edison Co.*, 271 F.3d at 1357).[18]

2.     The Character Of The Government
Action Weighs Heavily Against Finding A Taking

The next factor, the "character of the government action," also weighs heavily against finding a taking here.  As the Supreme Court held in *Penn Central*, "[a] 'taking' may more

---

[18]  The plaintiffs also lacked a reasonable investment-backed expectation that the employer contributions in which they claim a security interest would not be changed by Puerto Rico's legislature.  *See Section 552 Decision*, 948 F.3d at 469.

readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citations omitted). Under Section 552, as incorporated by PROMESA, "the Government does not physically invade or permanently appropriate any of the [bondholder's] assets for its own use." *Connolly*, 475 U.S. at 225.

Instead, Congress was motivated by "[a] combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing," plaguing the territorial government. 48 U.S.C. § 2194(m). "As a result of its fiscal emergency," Congress found, "the Government of Puerto Rico has been unable to provide its citizens with effective services." *Id*. This fiscal crisis "has also affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents and businesses." *Id*. Any interference with the bondholder's purported property rights "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under [the Supreme Court's] cases, does not constitute a taking requiring Government compensation." *Connolly*, 475 U.S. at 225.

### 3.      Plaintiffs Cannot Demonstrate Economic Impact

Finally, "in order to establish a regulatory taking, a plaintiff must show that his property suffered a diminution in value or a deprivation of economically beneficial use." *A & D Auto Sales, Inc*, 748 F.3d at 1157. Courts measure a diminution in value by the change in the fair market value of the property in question. *Id*. (citing *Forest Props., Inc. v. United States*, 177 F.3d. 1360, 1367 (Fed. Cir. 1999). "[I]f the regulatory action is not shown to have had a

negative economic impact on the [plaintiff's] property, there is no regulatory taking." *Id.* (quoting *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed.Cir.1999)).

As described in detail above, plaintiffs cannot show economic impact because they are still litigating how much they are entitled to recover on their bonds in the Title III proceedings. In fact, in those proceedings, the bondholders contend that the ERS bonds "expressly are payable from Pledged Property *regardless* of whether a valid and enforceable lien exists." *See* ERS Bondholders' Reply in Support of Motion for Judgment on the Pleadings, at 1 (emphasis added). A272. If that is true, plaintiffs would be entitled to no compensation, as "just compensation for a net loss of zero is zero." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 240 n.11 (2003). Here, plaintiffs cannot and do not allege that the government took their bonds or that they are unable to pursue collection on their bonds in the Title III proceedings. The Court should dismiss a takings claim for failure to state a claim when the plaintiffs' allegations "do not show any economic impact that would support a determination that a 'taking' occurred." *Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed. Cir. 1990).

VII.    Supreme Court And Federal Circuit Precedent
        Establishes That Mere Frustration Of A Contractual
        Expectancy Is Insufficient To Establish A Taking

In Count Three of their complaint, plaintiffs allege a taking of their "contractual right to timely payments of principal and interest from a particular stream of funds—employer contributions." Compl., ¶ 124. Plaintiffs claim that the First Circuit's *Section 552 Decision* decided that "the filing of ERS's Title III petition destroyed the ERS Bondholders' contractual right to be paid from employer contributions by retroactively applying § 552 to the Bondholders' interest in such funds . . . ." *Id.*, ¶ 126. As an initial matter, this is not what the First Circuit held. Instead, the Court ruled that the ERS Bondholders had no property interest in future

employer contributions and that the Bond Resolution (*i.e.*, the contract) "explicitly contemplated that the payment of Future Contributions was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures." *Section 552 Decision*, 948 F.3d at 468-69; *see also* Compl., Exhibit A at VI-16 (noting that legislative changes may "may adversely affect the ability of [ERS] to comply with its obligations.").

Even assuming plaintiffs' characterization were accurate, "as a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009). "The Supreme Court's decision in *Omnia Commercial Co. v. United States* . . . has long stood for that proposition." *Id.* (citing *Omnia*, 261 U.S. 502 (1923)). Thus, plaintiffs' allegation that "Section 552's *impairment* of the ERS Bondholders' contractual right to payment from employer contributions destroyed the economic value of the ERS Bondholders' bonds and their rights under the Bond Resolution *by eliminating the primary source of their repayment*," Complaint, ¶ 127 (emphasis added), fails to state a claim.

In *Omnia*, the Government requisitioned a steel company's entire production of steel plate for a year and "directed that company not to comply with the terms of [the plaintiff's] contract." 261 U.S. at 507. As the Federal Circuit described in subsequently applying *Omnia*, "notwithstanding that the government's action was specifically directed at Omnia, the [Supreme] Court held that the destruction of the contract did not constitute a compensable taking within the meaning of the Fifth Amendment." *Palmyra Pac. Seafoods, L.L.C.*, 561 F.3d at 1369. *Omnia* stands for the bedrock principle of takings law that "for consequential loss or injury resulting

45

from lawful governmental action the law affords no remedy" under the Takings Clause. 261 U.S. at 510.

Thus, the rule in *Omnia* turns on whether the government appropriated the contract right itself or only requisitioned "the subject-matter" that gave value to the contract. *Omnia*, 261 U.S. at 510-11; *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1379 (Fed. Cir. 2008) ("The Court of Federal Claims did not err in holding that Huntleigh had failed to establish a Fifth Amendment taking of its property. Huntleigh has conceded that the government did not actually assume its contracts.") (citing *Omnia*). Here, plaintiffs assert that "the ERS Bond Resolution gave Plaintiffs the contractual right to guaranteed timely payment of principal and interest from employer contributions and other collateral." Compl., ¶ 2. Plaintiffs do not allege that the Government actually appropriated their bonds.

Plaintiffs' claim amounts to an allegation that Section 552 made it more difficult for plaintiffs to obtain the contracted performance from ERS. Yet, under *Omnia*, that does not constitute a taking for Fifth Amendment purposes. 261 U.S. at 511; *accord Huntleigh,* 525 F.3d at 1380 (holding that Government action that "frustrated" plaintiff's "business expectations . . . does not form the basis of a cognizable takings claim."). Plaintiffs also appear to allege that the funds they believed should be used to repay them were directed elsewhere, which made it more difficult for ERS to meet its contractual obligation to make interest and principal payments on the bonds. *See e.g.*, Compl., ¶ 126-1277 (alleging that funds were "redirected away from the ERS Bondholders" and that the "impairment" of their "contractual right to payment" harmed the value of their bonds "by eliminating the primary source of their repayment."). Such actions cannot form the basis for a viable takings claim. *Air Pegasus of D.C., Inc.*, 424 F.3d at 1215 ("Therefore, Air Pegasus's economic injury is not the result of the government taking Air

Pegasus's property, but is the more attenuated result of the government's purported taking of other people's property. This circumstance does not form the basis for a viable takings claim.")

Additionally, plaintiffs' claims that the United States took their contracts are undermined by the simple fact that they are still enforcing their purported rights under the Bond Resolution through a breach of contract action in the Title III proceedings.  In their motion for judgment on those claims, they assert that they are entitled to pursue both recourse[19] and non-recourse breach of contract claims against ERS for violating the terms of the Bond Resolution. *See* ERS Bondholders' Mot. for Judgment On the Pleadings, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico* (No. 17-03566) (filed Jun. 10, 2020) at 7, 16-21 ("Thus, even after the Section 552 Decision, Claimants retain their contractual right to be paid from post-petition employer contributions, and that right remains enforceable regardless of whether the post-petition employer contributions have been diverted to the Commonwealth.")  A328, A337-45.  Because plaintiffs still have the ability to enforce their contract against ERS, they have failed to state a valid takings claim against the United States.  *See Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016) ("The government's instruction to Freddie Mac did not take anything from Mr. Piszel because, even after the government's action, Mr. Piszel was left with the right to enforce his contract against Freddie Mac in a breach of contract action.").

VIII.   The Independent Acts Of The Government Of Puerto Rico
        Cannot Be Attributed To The United States For Takings Purposes

Count One of the Complaint, which attempts to attribute actions of the Commonwealth legislature to the Board, must fail for an additional independent reason.  Even if, contrary to a declaration of Congress and a ruling by the Supreme Court, it was concluded that the Board is

---

[19]  Meaning that they are not limited to relying on the employer contributions as the source of repayment.

part of the Federal Government, the Board's actions would still not give rise to takings liability

on the part of the United States.  The enactment of Joint Resolution 188 and Act 106-2017,

which plaintiffs allege resulted in a taking of their collateral in Count One, was the result of

independent legislative actions by the governor and legislature of the Commonwealth.

The Supreme Court has held that the United States does not commit a taking when a state

or locality takes action that is part of a plan subject to approval by the Federal Government or

pursuant to Federal regulations.  *See Griggs v. Allegheny County, Pa.*, 369 U.S. 84, 89 (1962)

(holding that the Federal government was not liable for the taking of an air easement over

plaintiff's property, even where the airport was funded in part by a Federal grant based on

compliance with Federally approved plan).  Even "the federal government's conditioning a state

or locality's receipt of federal funds on the state's taking a particular action does not make that

state or locality an agent of the federal government" for takings purposes.  *B & G Enters., Ltd. v.*

*United States*, 220 F.3d 1318, 1323-24 (Fed. Cir. 2000) (citing *Griggs*, 369 U.S. at 89)).

In *B & G Enterprises*, the Federal Circuit rejected a takings claim against the United

States that was premised upon California enacting a statute restricting the operation of cigarette

vending machines to establishments that sold alcohol.  *See id*. at 1324-25.  Although California

took this legislative action in response to a Federal statute that conditioned states' receipt of

block grant funds upon enacting effective laws combating the use of tobacco by youth, the Court

held that this did not make the Federal Government liable for California's actions.  *See id*. at

1324.  Instead, the Court recognized that "the State of California is an independent sovereign,

which itself possesses the authority to enact legislation . . ." *Id*.  "In sum, it was California's

decision to create restrictions on the placement of tobacco vending machines, not the federal

government's.  Congress may have provided the bait, but California decided to bite." *Id*. at

1325; *accord Shewfelt v. United States*, 104 F.3d 1333, 1338 (Fed. Cir. 1997) ("[T]he United States is not liable for a taking based on its persuasion of the county to obtain the property from the state for resale to the Navy.").

Here, under PROMESA, the Board is empowered to, in relevant part, "submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan . . . ." 48 U.S.C. § 2145(a). This includes recommendations related to "the effects of the territory's laws . . . on the operations of the territorial government." *Id*. at § 2145(a)(7). The governor or legislature can choose not to adopt such recommendations, and provide an explanation for their decision, which they also forward to Congress and the President. *Id*. at § 2145(b)(3). Plaintiffs do not suggest that before the Board's recommendations, which plaintiffs allege ultimately resulted in the passage of Joint Resolution 188 and Act 106-2017, the Commonwealth's legislature and governor lacked the authority to enact such a measure under Puerto Rico law. *See B & G Enters.*, 220 F.3d at 1324 (no taking by United States where state already had authority to enact legislation).[20]

In their complaint, plaintiffs alternatively claim that "the Commonwealth acted 'under the authority of the Federal Government'" and cite two cases, *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (*en banc*) and *Hendler v. United States*, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991), in support of their contention. Complaint, ¶ 114. However, in *B & G Enterprises, Ltd.*, the Federal Circuit distinguished both these cases on grounds that apply equally here. *See* 220 F.3d at 1324. "The first distinction is that both cases involved a physical occupation, whereas this case does not. Moreover, in each case, an order from the federal

---

[20] To be sure, the ERS bondholders are challenging the validity of the legislation under PROMESA itself, however, that is distinct from challenging the inherent authority of the Commonwealth government to enact legislation.

government led to state action . . . . No such order was issued here." *Id*. Here, there was no physical occupation, nor any order from the Federal Government upon which the Commonwealth acted. Rather, the Board made recommendations as to measures it believed the Commonwealth should take to comply with the fiscal plan.[21]

Accordingly, even assuming that the Board's acts can be ascribed to the Federal Government, the Commonwealth's independent legislative actions cannot. For this additional reason, plaintiffs fail to state a takings claim upon which relief may be granted in Count One.

CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny plaintiffs' motion to amend their complaint. Moreover, even if leave to amend is granted, we respectfully request that the complaint be dismissed.

---

[21] Although plaintiffs allege that the Oversight Board "directed and required the Commonwealth to enact and implement Joint Resolution 188 and Act 106-2017," (Complaint, ¶ 112), the Court is not required to accept such barebones, conclusory allegations as true for purposes of a 12(b)(6) motion. *See Iqbal,* 556 U.S. at 679.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s Kenneth M. Dintzer by L. Misha Preheim
KENNETH M. DINTZER
Deputy Director

OF COUNSEL:

JASON E. MORROW
Attorney Advisor
U.S. Department of the
Treasury

L. MISHA PREHEIM
Assistant Director

ALISON S. VICKS
Trial Attorney

/s Christopher J. Carney
CHRISTOPHER J. CARNEY
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC  20044
Telephone:  (202) 305-7597
Facsimile:  (202) 307-2503
E-mail:  chris.carney@usdoj.gov

September 11, 2020

Attorneys for Defendant